825 A.2d 591

Jorge F. FERRER, M.D., Appellant,

v.

TRUSTEES OF the UNIVERSITY OF PENNSYLVANIA, Michael Aiken, Provost, Barry S. Cooperman, Vice–Provost for Research, Edwin Andrews, Dean of School of Veterinary Medicine, and Jeffrey Roberts, Associate Dean of School of Veterinary Medicine, Appellees.

Supreme Court of Pennsylvania.

Argued Oct. 15, 2001.

Decided Dec. 30, 2002.

Reargument Denied July 8, 2003.

312

Thomas A. Sprague, Richard A. Sprague, Joseph R. Podraza, Philadelphia, for Jorge F. Ferrer.

David Rudovsky, for Trustees of the U. of P., et al.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NEWMAN and SAYLOR, JJ.

## *OPINION*

Chief Justice ZAPPALA.

This is an appeal by Dr. Jorge F. Ferrer from the Memorandum Opinion and Order of the Superior Court reversing the judgment of the Philadelphia County Court of Common Pleas that had been entered following a jury's award of $5,000,000 in damages to Dr. Ferrer in his breach of contract claim against the Appellees. The Superior Court also determined that judgment should be entered in favor of the Appellees and remanded the matter for proceedings consistent with its decision. We granted allocatur to address the following issues: (1) whether the Superior Court erred in finding that Dr. Ferrer did not sustain compensable damages and thus was unable to establish that he suffered harm from the University of Pennsylvania's breach of contract; and (2) whether the Superior Court erred in finding that the jury instructions were insufficient and would warrant a new trial.

In short, we conclude that the trial court did not err in denying judgment n.o.v. to the Appellees because Dr. Ferrer adequately established that a breach of contract by the University caused him harm, and that the trial court properly

denied the Appellees' request for jury instructions limiting the basis for their award of damages. We also conclude, however, that the award of damages must be reduced from $5,000,000 awarded by the jury to $2,900,000, plus prejudgment interest to be determined on remand to the common pleas court.

On June 19, 1992, Dr. Ferrer initiated this action by filing a writ of summons. On April 29, 1993, a complaint was filed asserting several causes of action, including breach of contract and conspiracy to breach his employment agreement, against the Trustees of the University of Pennsylvania and several university administrators.[1] The complaint asserted that Appellees had breached Dr. Ferrer's rights under the University's Procedures Concerning Misconduct in Research when Dean Edwin Andrews of the School of Veterinary Medicine unilaterally imposed sanctions upon Dr. Ferrer that precluded him from conducting or supervising research on human leukemia virus for a period of two years.

The Procedures Concerning Misconduct in Research established procedures for handling research misconduct by standing and associated faculty.[2] The complaint alleged that the Procedures constituted part of Dr. Ferrer's contract with the University. Pursuant thereto, an investigation was conducted into the handling of Dr. Ferrer's research program in June of 1990, for reasons that will be addressed in detail.

Following the investigation, the Formal Investigative Committee determined that Dr. Ferrer was not guilty of misconduct. The Procedures specifically provided that

> [i]f the report of the formal investigation committee finds the charges to be unfounded, the matter shall be dropped and the concerned parties shall be informed. The dean and the Provost have the responsibility to take an active role to

1. The administrators included Provost Michael Aiken, Vice–Provost for Research Barry S. Cooperman, Dean of the School of Veterinary Medicine Edwin Andrews, and Associate Dean of the Veterinary School Jeffrey Roberts.

2. Misconduct is defined thereunder as "fabrication, falsification, plagiarism, or other serious deviation from accepted practices in proposing, carrying out, or reporting results from research." R. 41a.

repair any damage done to the reputation of the respondent or the complainant (provided the complainant acted in good faith), and to take appropriate action should they determine that the accusation was knowingly false.

R. 45a.

The complaint alleged that despite the committee's findings, Dean Andrews and Provost Aiken imposed severe penalties on Dr. Ferrer as if he had been found guilty of misconduct. The penalties prohibited Dr. Ferrer from conducting any animal research for two years, including research involving human leukemia virus (HTLV–I) and bovine leukemia virus, and prohibited Dr. Ferrer from conducting any research, including laboratory work on HTLV–I or any other human pathogens for two years. The complaint alleged that Dean Andrews lacked the authority to impose such sanctions upon Dr. Ferrer after the Formal Investigative Committee had determined that Dr. Ferrer was not guilty of misconduct in research. It was further alleged that, as a result of the sanctions, Dr. Ferrer was not able to continue his research or maintain his laboratory.

The matter was tried before a jury. The jury found in favor of Dr. Ferrer and awarded damages in the amount of $5,000,000. A jury verdict form was completed by the jurors that set forth the following questions and responses regarding the issues submitted for their deliberation:

1. Were the Procedures Concerning Misconduct in Research part of the terms and conditions of Dr. Ferrer's contract of employment with the University of Pennsylvania?

[The jury checked "Yes."]

2. Did the defendants breach or violate Dr. Ferrer's employment contract or the terms and conditions thereof?

[The jury checked "Yes."]

3. Did you find that Dr. Ferrer was harmed by any breach or violation of his employment contract or any terms and conditions thereof?

[The jury checked "Yes."]

4. State the amount of money, if any, you would award to compensate Dr. Ferrer for the breach or violation of his employment contract or the terms and conditions thereof? [The jury responded "$ 5 million."]

5. Did you find that two or more of the individual defendants, that is, defendant Michael Aiken, defendant Barry S. Cooperman, and/or defendant Edwin Andrews, conspired or acted in concert to breach or violate Dr. Ferrer's employment contract or the terms and conditions thereof?

[The jury checked "Yes."]

R. 2169–2170a.

The Appellees filed a motion for post-trial relief, seeking judgment n.o.v. or, alternatively, a new trial. They also filed a motion for remittitur, claiming that the award of damages was arbitrary, excessive and unsupported by the evidence. Dr. Ferrer filed a conditional motion for post-trial relief. On May 20, 1999, the trial court denied Appellees' post-trial motion, dismissed Dr. Ferrer's motion as moot, and entered judgment for Dr. Ferrer. The Appellees appealed to the Superior Court; Dr. Ferrer then filed a conditional cross-appeal. On May 9, 2000, a panel of the Superior Court issued a memorandum opinion and order, reversing the judgment of the trial court and concluding that judgment should have been entered in favor of the Appellees. We granted Dr. Ferrer's petition for allowance of appeal on December 7, 2000.

In *Adamski v. Miller*, 545 Pa. 316, 681 A.2d 171 (1996), we stated:

[t]he proper standard of review for an appellate court when examining the lower court's refusal to grant a judgment n.o.v. is whether, when reading the record in the light most favorable to the verdict winner and granting that party every favorable inference therefrom, there was sufficient competent evidence to sustain the verdict. *Wenrick v. Schloemann–Siemag Aktiengesellschaft*, 523 Pa. 1, 4, 564 A.2d 1244, 1246 (1989). Questions of credibility and conflicts in the evidence are for the trial court to resolve and the reviewing court should not reweigh the evidence. *Com-*

*monwealth, Dep't of Transp., Bureau of Traffic Safety v. Korchak,* 506 Pa. 52, 57, 483 A.2d 1360, 1362 (1984). Absent an abuse of discretion, the trial court's determination will not be disturbed.

*Id.* at 173.

Applying this standard of review, the evidence established the following facts.[3] In 1957, Dr. Ferrer obtained his medical degree in Argentina. Several years later, he decided to become a research scientist and dedicate his career to leukemia and cancer research. He came to the United States in 1964 for this reason and eventually became a U.S. citizen.[4] After receiving the Eleanor Roosevelt Fellowship from the International Union of Cancer, he went to Stanford University in California where he worked as a research associate.

Dr. Robert R. Marshak, a professor of the University of Pennsylvania for 37 years and Dean of the School of Veterinary Medicine for 17 of those years, recruited Dr. Ferrer to join the University to become involved in research into the disease of bovine leukemia in cattle. Bovine leukemia in cattle was described by Dr. Marshak as a disease that is very similar to a form of leukemia in humans. Dr. Marshak had a group that was doing research into how the disease occurred, in what distribution, and in what breeds of cattle.

Dr. Marshak decided that they needed to develop a very sophisticated laboratory to study the fundamental questions raised by their studies. It was then that Dr. Marshak began to recruit Dr. Ferrer. Dr. Ferrer's background in tumor immunology was important in addressing why some animals contracted the disease and other animals did not. He expect-

3. In order to understand the context in which the issue of damages arose, it is necessary to set forth a detailed statement of the facts giving rise to Dr. Ferrer's claim for breach of contract. The focus of our inquiry is limited to the damages that were awarded by the jury. The existence of an employment agreement and the breach of that agreement by the University are not in dispute before this Court.

4. Dr. Ferrer left his homeland because he believed that American universities were committed to supporting and encouraging freedom of research. This was particularly important to him coming from a country that he described as "very authoritative" and where "you are sometimes treated arbitrarily from pursuing your career." R. 1461a.

ed Dr. Ferrer to develop a large laboratory group that would study the various aspects of bovine leukemia.

Dr. Ferrer agreed to join the University because of his interest in the bovine leukemia in cattle. Dr. Ferrer felt that the treatment of leukemia in cattle offered unusual opportunities to understand the role of viruses and the cause of leukemia in relation to humans. He expected the research involving bovine leukemia would provide opportunities that were not available in the studies of leukemia in mice that were prevalent at the time.

Dr. Ferrer was offered a position of associate professor at the University initially without tenure, but with an assurance that he would be offered tenure within 5 years. He served as the head of the Veterinary School's comparative leukemia unit and its viral oncology section.[5] He received tenure before the expiration of the 5 year period.

When Dr. Ferrer arrived at the University, he wanted to develop a new model for studies of human leukemia. He used the bovine leukemia as the basis of his model. In order to develop this model, the first requirement was to demonstrate that leukemia in cattle was due to a virus. R. 1471a.

Dr. Marshak testified that through the years, Dr. Ferrer identified the virus, demonstrated that the virus was the real cause of the disease, and described the mode of transmission of the virus from animal to animal. Dr. Ferrer developed sensitive and reliable tests to identify the animals that were infected with the virus. He was also able to clone the genome of the virus.[6] Dr. Ferrer established that the bovine leukemia virus was fundamentally different from all known leukemia viruses and predicted in one of his publications that if a human leukemia virus was identified, it would be a relative of the bovine leukemia virus. His theory ultimately proved to be correct. R. 533a–536a.

**5.** Viral oncology involves the relationship between viruses and all types of cancer, including leukemia. R. 1466a.

**6.** Dr. Marshak explained that the genome "is the genes that are in the virus that tell the virus what to do when it's injected in the body." R. 534a.

Dr. Ferrer set out to develop the bovine leukemia system, which he described as "a very systematic and painstaking process." The virus had to be grown in large quantities for study. Once the properties of the viruses were examined, studies were done to identify how the virus was transmitted from one animal to another. The information that was gathered was intended to be applied to the study of human leukemia. R. 1475a.

Dr. Ferrer recruited and trained scientists to assist him in his research program. At the same time, he had to attract funding to sustain his research. From the beginning, Dr. Ferrer's research was sustained by the funding that he obtained. His funding efforts enabled him to pay for the salaries of all of the people who worked in his laboratory, including technicians, assistant professors, research associates and secretaries. Dr. Ferrer was responsible as well for the costs of animals purchased for use in his experiments and for maintaining the animals that he used in his research. R. 539a–541a, 669a, 1472–1474a.

One of the major resources that Dr. Ferrer developed was a herd of cattle that was considered by Dr. Marshak to be a "national treasure" for research purposes. Dr. Marshak indicated that the herd was "the only one of its kind in the world." R. 540a. The particular characteristic of the herd that made it so important was that two kinds of families had been identified within the herd for purposes of the disease. Studies had indicated that some families always contracted leukemia, but other families in the same environment that were treated the same never contracted the disease. R. 533a. This unique characteristic of the herd was essential to Dr. Ferrer's research into what mechanism triggered some infected animals to develop leukemia, while others did not. R. 1473a.

With these resources in place, Dr. Ferrer investigated whether a blocking factor might exist in the animals that functioned as a natural defense against infection by preventing the virus from replicating and reaching target cells. It was anticipated that the identification of a blocking factor would explain a crucial characteristic of the infections caused by

human leukemia virus as well as the bovine leukemia virus. As with the bovine leukemia virus, the human leukemia virus did not result in disease in every incident of exposure.[7] His hypothesis was that the same blocking factor was operating in the case of humans. He believed that once purified and made available in larger quantities, the blocking factors would provide a very powerful tool to treat leukemia and to prevent infected people from eventually developing leukemia. R. 1476a–1478a.

In the course of his research, Dr. Ferrer discovered a soluble factor in the plasma of diseased animals that prevented infected cells from producing more virus. He also discovered a factor in the plasma that stimulated the expression of the virus. Dr. Marshak explained that this was a novel discovery at the time that later became "one of the hottest issues in leukemia research." R. 536a–537a.

Dr. Ferrer designed an experiment for the development of an animal model for the human leukemia virus (HTLV–I) using sheep and cattle. The purpose of the program was to study a number of events regarding susceptibility and resistance to the disease and the mechanism by which the virus causes the disease. He submitted a protocol, entitled Transmission of HTLV–I to Cattle and Sheep, to the Institutional Animal Care and Use Committee (IACUC) for the experiment. The protocol was approved by EHSO on March 6, 1990, and subsequently by IACUC on March 29, 1990. The approval specified that "Biosafety Level 2 Practices and Procedures must be followed." [8] R. 49a, 538a, 1486a.

After he obtained approval for the experiment, Dr. Ferrer began his efforts to locate lambs for inoculation. The University's New Bolton Center routinely sold lambs to investigators for research purposes. Dr. Ferrer negotiated the purchase of

7. Dr. Ferrer testified that the large majority of people infected with human leukemia virus do not develop leukemia. R. 1478a.

8. The protocol indicated that 12 to 14 sheep and 6 heifers were to be used in the experiment. The animals were to be inoculated with human blood lymphocytes infected with HTLV–I. The sheep were to be housed in Leukemia Barn E and the cattle would be kept in the leukemia field.

the lambs for his research with Dr. Coyne, the veterinarian who was in charge of the teaching flock of animals. Dr. Ferrer explained to Dr. Coyne that he would be conducting an experiment that would involve the inoculation of lambs with HTLV–I and the general purpose of the experiment. Dr. Coyne selected the lambs that were being assigned to the experiment and put tags on the ears of the lambs to distinguish them from the other lambs. R. 1512a–1513a.

The practice was to seek authorization from the principal investigator of a research project, in this case Dr. Ferrer, before any procedures could be conducted on animals involved in a research project. Dr. Ferrer never authorized any kind of invasive procedures to be conducted on the lambs that were involved in the experiment. He indicated that the conditions of the experiment would have been nullified by such procedures and could have resulted in stress or death to the animals. R. 1513a–1514a.

Despite the established practice, veterinary students performed invasive procedures, such as tail-docking and castration, on the lambs involved in Dr. Ferrer's research, and Dr. Coyne permitted children to pet the lambs during tours of New Bolton Center, without Dr. Ferrer's authorization. Dr. Ferrer was never consulted about the use of the animals by the veterinary students or the children's contact with the lambs. *Id.*

Dr. Bernard Poiesz was involved in the discovery of the human leukemia virus in 1978 while working with the National Cancer Institute. He was also involved in extensive epidemiological studies to determine the mode and manner of transmission of HTLV–I. HTLV–I was described as a retrovirus that is transmitted in the same way that HIV is passed, i.e., sexual intercourse, breast feeding, blood transfusions, and the sharing of needles among intravenous drug abusers. HTLV–I is not transmitted by casual contact. Dr. Poiesz indicated that there was virtually no risk to the children and "a very infinitesimally small risk to [the] veterinary workers" in this case. There was no scientific evidence of a person ever having contracted leukemia under such circumstances, a fact known

to the medical community when this incident occurred in 1990. R. 917a, 929a–939a.

When it was discovered that veterinary students and children had come into contact with the lambs, IACUC suspended Dr. Ferrer from further animal research pending the outcome of an investigation. Dr. Ferrer was able to supervise others, however, with respect to the animal research. This enabled the other researchers who worked with Dr. Ferrer to continue the animal research during this time. No restrictions were placed on Dr. Ferrer's ability to work with HTLV–I in the laboratory. R. 1539a–1540a.

The University's Handbook for Faculty and Academic Administrators sets forth the rights and privileges for members of the standing faculty. The Handbook states:

> The protection of academic freedom of individual teachers and scholars is the instrument by which society at large is protected from hindrances to the search for knowledge and from limits on the dissemination of knowledge. The statutes of the University hold that a system of tenure for faculty members is the preeminent means of fostering and protecting academic freedom of the faculty in teaching and in scholarly inquiry.

> The tenure system consists of rules and procedures which establish an essentially self-regulated body of scholars enjoying the continuity of existence and economic security within which academic freedom is both fostered and protected. The protections of academic freedom are extended to all members of the faculty during their terms of appointment. The rights and privileges embodied in the tenure system are extended to all members of the Standing Faculty during their terms of appointment.

R. 523a–524a. The Handbook provides for Procedures Concerning Misconduct in Research, which establishes the procedures to be followed when allegations of misconduct in research have been made against faculty members.

On June 11, 1990, Dean Andrews initiated an investigation into the incident pursuant to the Procedures Concerning Mis-

conduct in Research. Under the Procedures, the dean is required to appoint a preliminary inquiry committee consisting of at least two individuals. The preliminary hearing committee is charged with the responsibility of gathering information and determining whether the allegation warrants a formal investigation. The committee then submits a written report of its findings, with a copy to the Provost, complainant and respondent. The respondent is given an opportunity to submit a written reply to the report.

When the report of the preliminary inquiry committee finds that a formal investigation is not warranted, the dean may: (1) initiate a formal investigation despite the recommendation of the preliminary inquiry committee, (2) not initiate a formal investigation, but take other action as the circumstances warrant, or (3) drop the matter. The decision is reviewed by the provost. When the report of the preliminary inquiry committee finds that a formal investigation is warranted, or the dean or provost decides that a formal investigation should be conducted, then the dean is required to notify the complainant and respondent, identify the complainant to the respondent and initiate a formal investigation as specified by the Procedures.

The preliminary inquiry committee submitted its report and recommended that there be a formal investigation. The committee indicated that it felt that a formal investigation was needed "to determine the exact seriousness of the risk to University personnel and students and the public and whether culpability exists among the individuals indicated and with the University procedures." [9] R. 57a.

9. The preliminary inquiry committee indicated that Dr. Ferrer, as the principal investigator, was primarily responsible for knowing and adhering to the restrictive conditions applicable to his research. It determined that Dr. Ferrer did not ensure limited access to the inoculated lambs and did not post warning biohazard signs because he did not know that was required. In part, the committee attributed that to Dr. Ferrer's knowledge that animals infected with HTLV–I do not pose a threat to humans or other animals because the possibility of transmission is so remote.

The committee questioned, however, whether the regulatory procedures of the University were adequate to inform investigators about the

Pursuant to the Procedures, to initiate a formal investigation, the dean is required to appoint a formal investigative committee of not less than three individuals. None of the individuals who were members of the preliminary inquiry committee may be appointed. The Procedures define the responsibility of the formal investigative committee as follows:

> The formal investigative committee shall undertake a thorough examination of the charges, including, without limitation, a review of all relevant research data and proposals, publications, correspondence, and memoranda of telephone calls. Whenever possible, interviews shall be conducted with the complainant and respondent, as well as others having information regarding the allegations. Summaries of the interviews shall be prepared, provided to the interviewed party for comment or revision and included as part of the investigatory file. During its proceedings the committee shall have access to and consult legal counsel. When appearing before the committee, the respondent and the complainant may each be accompanied by an adviser, who may be a lawyer but who may not participate in the proceedings. The committee shall not conduct formal hear-

Biosafety Level 2 requirements. The committee identified several lapses in the University's procedures that it believed had contributed to Dr. Ferrer's failure to implement the Biosafety Level 2 practices. The committee observed that the University Biological Safety Manual provided to researchers failed to identify limited access to the animals as one of the Biosafety Level 2 practices. The committee concluded that the University's Environmental Health and Safety Office should have done more "to insure that investigators know what provisions must be implemented to satisfy the specific requirements associated with their assigned biosafety level." R. 54a–56a.

Based upon these concerns, the committee identified the following as "Improvements Necessary in Current Procedures":

> (1) An uncomplicated mechanism should be implemented to insure that all investigators are aware of the specific requirements associated with their assigned Biosafety Level designations before approval is given to a study.

> (2) The CDC–NIH manual or better piece of literature should be distributed to all principal investigators assigned a Biosafety Level designation and to all other investigators who request it by the University free of charge.

> (3) An EHSO representative should be present at the New Bolton Center.

R. 57a.

ings. Except in unusual cases, the respondent and the complainant shall not appear before the committee at the same time.

R. 441a.

Dean Andrews appointed the members of the formal investigative committee. On October 9, 1990, the committee issued a formal report with respect to its evaluation, findings and conclusions. The committee concluded that Dr. Ferrer was not guilty of misconduct in research. The committee regarded its report as a final disposition of the matter. Two weeks after Dean Andrews received the report, however, the chairman of the committee received a memorandum from Dean Andrews identifying several individuals that the committee should interview and outlining several questions that he believed the committee should answer. The Procedures do not authorize the involvement of a dean in the formal investigative process once the committee has been established. The committee elected to interview the individuals identified by Dean Andrews, despite his interjection into the process, in a spirit of cooperation.

The committee reached the same conclusion after the extended investigation, that Dr. Ferrer was not guilty of misconduct in research. On December 4, 1990, the committee sent its report to Dean Andrews. In its accompanying letter, the committee stated, "[w]e feel the incident has been explored in fully satisfactory detail in order to make a judgment as to whether scientific misconduct took place, and it is our firm opinion that it did not." R. 713a.

In its report, the committee recognized the role that a principal investigator has in animal research experiments. The committee found that, as principal investigator, Dr. Ferrer was responsible for carrying out the restrictive conditions that applied to his research. The committee further determined, however, that the rules that dictated the segregation of the animals were ambiguous and that, according to the University Biosafety Manual, the knowledge and judgment of the principal investigator were critical in assessing the risks and

applying the recommendation of the guidelines. The committee indicated that Dr. Ferrer should have anticipated the possibility that individuals would have had contact with the animals.

The committee concluded that the failure to segregate the lambs was a violation "of a low order because the likelihood of infectivity from the types of contact that occurred were very low." [10] Furthermore, the committee found that the lack of communication among University Laboratory Animal Resources (ULAR), the Environmental Health and Safety Office and the ULAR veterinarian assigned to the New Bolton Center contributed to Dr. Ferrer's error. The committee indicated that this specific incident could have been easily avoided if the University Laboratory Animal Resources had a practice of inspecting facilities prior to the start of an experiment. [11]

Once the formal investigation has been completed and the written report has been submitted by the committee, the University's Procedures specify the appropriate action to be taken. The dean lacks authority to take any action against the respondent when the formal investigation committee finds that the charges are unfounded. It is only where the committee finds that the respondent is guilty of misconduct in research that the dean may proceed to take further actions that are specifically set forth in the Procedures.

*3.2 If the report of the formal investigation committee finds the charges to be unfounded, the matter shall be dropped and the concerned parties shall be informed. The dean and the Provost have the responsibility to take an active role to repair any damages done to the reputation of the respondent* or the complainant (provided the complain-

---

**10.** The committee noted in its report that all of the published literature indicated that transmission of HTLV–I by casual contact was extremely low.

**11.** The committee referred to "a storm of negative publicity" regarding the incident, stating that "[w]hile we regret the incident and the part played by Dr. Ferrer, the committee strongly believes that there was not so serious a deviation as to be considered as misconduct of research." R. 2164a.

ant acted in good faith), and to take appropriate action should they determine that the accusation was knowingly false.

3.3 If the report of the formal investigation committee finds the charges against a faculty member to be substantiated, the dean shall proceed to take whatever actions are appropriate to the seriousness of the offense and in accordance with University procedures and which consider the previous record of the respondent. For major offenses by members of the standing or research faculties, the dean shall consult with members of the faculty concerned to aid in determining whether there is substantial reason to believe that just cause exists for suspension or termination, and shall take other steps as may be appropriate under the University's procedure for Suspension or Termination of Faculty for Just Cause. For less serious offenses, which do not warrant suspension or termination, the dean may impose penalties including, but not limited to, removal from a particular project, a letter or reprimand, special monitoring of future work, probation, or below average salary increases, including zero salary increases, for one or more years.

3.3 The respondent shall have access to all established University grievance and appeal procedures in accordance with the stated jurisdiction of such procedures.

3.4 When the report of the formal investigation committee finds charges have been substantiated, the Provost shall take appropriate steps to correct any misrepresentation resulting from the misconduct in question. Collaborators, professional societies, and other affected institutions and individuals shall be informed. If misrepresented results have been submitted for publication, already published, or otherwise disseminated into the public domain, appropriate journals and other sponsors shall be notified.

R. 44a–45a. (emphasis added).

In disregard of the Procedures, Dean Andrews failed to drop the matter or take an active role to repair any damage done to Dr. Ferrer's reputation once the committee's final report was issued. Dean Andrews indicated that he simply

did not agree with the committee's determination that Dr. Ferrer's actions were not a serious violation. R. 1422a. Dean Andrews imposed severe sanctions upon Dr. Ferrer after the committee found that Dr. Ferrer was not guilty of misconduct in research.[12]

On January 31, 2001, Dean Andrews sent a letter to IACUC recommending that restrictions on Dr. Ferrer's authority to conduct animal research be maintained for an additional two year period. R. 604a. This letter followed Dean Andrews' meeting with several individuals.

By letter dated February 1, 1991, Dean Andrews informed Dr. Ferrer that the following sanctions would be imposed:

(1) Dr. Ferrer was prohibited from conducting or supervising any studies on the HTLV–I virus, or other known or suspected human pathogens; [13]

(2) the University's restrictions on his ability to conduct animal research would continue for a period of two years;

(3) Dr. Ferrer's laboratory would be monitored by the University's Office of Environmental Health and Safety on an unannounced, periodic basis.

(4) Dr. Ferrer would be required to successfully complete an approved course on the handling of biohazardous agents within a two year period.

The sanctions imposed by Dean Andrews were broader in scope than those imposed by IACUC while the University's investigation were pending because they precluded Dr. Ferrer not only from conducting his research but also from supervis-

12. The decision to impose sanctions was reached after Dean Andrews consulted with other administrators, including Provost Michael Aiken and Vice–Provost Barry Cooperman. R. 1730a. The references to Dean Andrews' sanctions in this opinion are intended to reflect the collaborative decision-making of Dean Andrews and those administrators.

13. The restrictions on Dr. Ferrer's ability to conduct and to supervise the animal research involving the HTLV–I virus were made retroactive to June 8, 1990. The prohibition imposed on Dr. Ferrer was to run until June 8, 1992.

ing the laboratory personnel who had continued his animal research during that time.

Additional steps were taken by the University to inform significant funders of Dr. Ferrer's research, including the Kleberg Foundation. The Kleberg Foundation had been a main source of Dr. Ferrer's funding over the years. On February 11, 1991, Jeffrey P. Roberts, the University's Assistant Dean for Development and Planning, sent a letter to the Grants Coordinator for the Kleberg Foundation. The University's letter advised the Kleberg Foundation that Dean Andrews, "responding to the serious errors in Dr. Ferrer's judgement," had imposed the sanctions detailed above. R. 60a–61a.

In addition, the letter discussed the remaining funds for Dr. Ferrer's research that had been the subject of a previous grant by the Kleberg Foundation, stating in relevant part:

> The restrictions on Dr. Ferrer's research place in limbo the monies received from the Foundation to support the project. As you know, the research accounts were placed under the control of Dr. Charles Benson, Chairman of Clinical Studies at New Bolton Center. To date, of the $376,605 from the original grant, $225,503 remains. (A budget accounting is attached. On February 28, 1991, the Office of Research Accounting is scheduled to send its annual report to the Foundation.)

> We need the Foundation's guidance as to how to manage the remaining funds. A number of options may exist; we have identified several: one, keep the fund frozen until June 8, 1992, when it would become available to Dr. Ferrer; two, have Dr. Ferrer define a new project within the sanction guidelines and submit a request to the Foundation for such a redirection; three, have the School identify an alternative research program conducted by different faculty and submit a request to the Foundation for a re-allocation; recognizing that the grant is supporting four research staff in Dr. Ferrer's laboratory; and, four, return the funds.

> Perhaps other choices will emerge in your discussions; obviously, we prefer not having to return the funds. We

want very much to respond to the trustees' wishes in what is surely a unique circumstance and will, therefore, abide by your instructions.

*Id.*

Members of the academic community responded to Dean Andrews' disregard of the University's obligations to drop the matter and to restore Dr. Ferrer's reputation. This was to no avail, however. One of the members of the Formal Investigative Committee, Dr. Donald F. Patterson, had sent a letter to Provost Michael Aiken and Dean Andrews after he learned that Dr. Ferrer's research was being blocked. The letter was sent two days before Dean Andrews imposed the sanctions.

Dr. Patterson testified about his concerns that had prompted him to send the letter.

Q. Why did you send this letter, sir?

A. It's a bit complicated. I think, first of all, I should say that, as I said before, I didn't really know Dr. Ferrer very well prior to this investigation, but I had an opportunity to hear him speak and know a bit more about him. I realized that he is a very sincere and honest person, and that in view of our finding that he was not guilty of misconduct in research.

When I realized that during that period after we submitted our report that, actually, rather than repairing some of the damage that had been done to Dr. Ferrer's research situation, restoring his laboratory of operation, he was, in fact, blocked from continuing his research. I knew that he was an outstanding research person with original ideas, and he contributed a great deal to the understanding of blood cancer and that he had made some recent very important discoveries which were important in the whole field and potentially important in treatment and perhaps even the cure of leukemia.

*So I was very distressed to find out that rather than doing what I thought was the university's responsibility to do so, to see that he had been essentially acquitted from the charge, that he was being blocked, his research could not go*

*forward. So I thought that this was an injustice on the part of the university, and so I felt I should speak out for that reason.*

R. 717a–718a (emphasis added).

After the sanctions were imposed, the Senate Committee on Academic Freedom and Responsibility (SCAFR) reviewed a complaint filed by Dr. Ferrer relating to Dean Andrews' actions. SCAFR was created pursuant to the Statutes of Trustees, the operating constitution by which the University is governed. Under the Statutes of Trustees, SCAFR is comprised of seven members who are elected by the university senate of all faculty. The committee's function is to advise and consult with each of the twelve college faculties that made up the University. In addition, each of the twelve colleges had its own committee for Academic Freedom and Responsibility. The committees served to advance the University's stated policy of maintaining and encouraging "the freedom of inquiry, discourse, teaching, research and publication" and of protecting "any member of the academic staff against influences, from within or without the university, that would restrict him or her in the exercise of these freedoms in his or her area of scholarly interest." R. 979a, 984a.

On May 30, 1991, SCAFR submitted a report. The committee concluded that once the Formal Investigative Committee had decided that Dr. Ferrer was not guilty of misconduct in research, that it violated Dr. Ferrer's academic freedom to prevent him from conducting his research. The committee found that the sanctions imposed by Dean Andrews were inappropriate and should be rescinded.

SCAFR concluded also that the University should provide Dr. Ferrer with assistance as necessary to keep his laboratory operating so that he could again compete successfully for external funds. It was further recommended that a suitable letter from a senior officer of the University should be written to the Kleberg Foundation and other appropriate agencies. R. 1003a, 1010a. Dean Andrews rejected SCAFR's recommendations. Although the recommendations were not binding

on Dean Andrews, there was no other time that SCAFR had published a report recommending that sanctions be rescinded and the recommendation was not accepted. R. 1008a–1010a.

The effects of the sanctions were devastating. The animal research that was being conducted by Dr. Ferrer was completely shut down as a result. Since Dr. Ferrer was prohibited from even supervising the animal research, his research staff could no longer be supported financially and subsequently left; his animal colonies were dismantled; and his unique herd of cattle could no longer be maintained and had to be sold. These resources were critical to Dr. Ferrer's ability to obtain data necessary to remain current in the area of retroviruses. Dr. Ferrer estimated that he had received over a million dollars in funding from the Kleberg Foundation in the course of his research, but did not receive "another penny" after Dean Andrews imposed his sanctions. R. 1559a, 1571a.

The University refused to provide Dr. Ferrer with serum samples and plasma that would have enabled him to continue a small part of his laboratory research within the parameters of the sanctions. Dr. Ferrer repeatedly requested that he be provided with samples from June of 1990, through July of 1991. Dean Andrews acknowledged that there was no reason that he knew of that additional serum and plasma could not have been obtained from the sheep and provided to Dr. Ferrer. He also acknowledged that Dr. Ferrer would have been permitted to use those materials in laboratory research even under the restrictions that were originally imposed by IACUC when the matter was originally under investigation. R. 1411a. Nevertheless, the samples were withheld from Dr. Ferrer for over a year until July 25, 1991. R. 1809a.

Based upon this evidence, the jury found that the Procedures Concerning Misconduct in Research were part of the terms and conditions of Dr. Ferrer's employment contract with the University, that the University had breached the employment agreement by imposing sanctions on Dr. Ferrer after the Formal Investigative Committee found that Dr. Ferrer was not guilty of misconduct in research and that Dr. Ferrer was harmed by the University's breach of his employ-

ment contract. The jury awarded Dr. Ferrer damages in the amount of $5,000,000.

When the Appellees filed their motion for post-trial relief, seeking judgment n.o.v. or a new trial, the trial court rejected their claim that the verdict was not based on sufficient evidence and denied their request for a remittitur of damages. The trial court reasoned that Dr. Ferrer was entitled to recover those damages traditionally recognized under Pennsylvania law for breach of contract. The trial court observed that "the goal of awarding damages for breach of contract is to make the plaintiff whole again, by awarding the non-breaching party a sum that would put them in as good a position as he/she would have been, had the contract been performed." Trial court slip op. at 6 (citing *Trosky v. Civil Serv. Comm'n*, 539 Pa. 356, 652 A.2d 813, 817 (1995)). The court further noted that in awarding damages for breach of contract, the jury was permitted to consider the non-breaching party's expectation interest, "which can be measured by (1) the loss in value, to the injured party, of the breaching party's performance; (2) any other losses, such as those caused by the breach which are incidental and consequential (3) less, any cost or other loss the injured party has avoided by not having to perform." Slip op. at 6–7 (citation omitted).

The trial court determined that the jury had reasonably concluded that $5,000,000 was the amount necessary to make Dr. Ferrer whole again for the loss of his research program. The court based its conclusion upon evidence that had established that, as a result of the University's improper sanctions, Dr. Ferrer lost his entire research staff and nationally treasured flock, as well as evidence regarding the amount of money needed to restore Dr. Ferrer's program to its pre-existing level when the sanctions were imposed.

The Superior Court reversed the trial court, finding that Dr. Ferrer did not suffer any damages whatsoever from the breach of his employment contract, since, in its view, the only basis for a claim for damages could be a claim for loss of future funding. On this basis, the court found that judgment should be entered in favor of the Appellees. The court also

found that the trial court's instructions regarding damages were improper, but found it unnecessary to award a new trial based on its reversal of the judgment for Dr. Ferrer.

Dr. Ferrer asserts that the Superior Court erred in determining that he did not suffer any damages as a result of the sanctions. He argues that the evidence was uncontroverted that he had a contract of employment and that, as part of the terms and conditions of his employment contract, the Appellees could not impose the improper sanctions that had the effect of destroying his ability to continue the research program he had developed and cultivated for over twenty years. Dr. Ferrer asserts that the jury properly awarded damages arising from the Appellees' improper interference with his contractually protected interest to pursue his research. Moreover, Dr. Ferrer asserts that the jury properly based its award in this regard on the evidence that he presented at trial. We agree.

■ We find that the Superior Court erred in characterizing Dr. Ferrer's claim for damages as one necessarily involving the loss of future funding by third parties. This was not the basis for the jury's award of damages. Dr. Ferrer's claim for damages was not premised on funding that he was projecting to receive in the future. Nor did Dr. Ferrer claim to have lost any salary or benefits. R. 1923a, 1931a. Instead, he sought to recover damages sustained by the University's actions that halted his ability to perform his scientific research, as the University's breach resulted in the complete dismantling and destruction of his research program. Dr. Ferrer's pursuit of damages in this regard was appropriate based upon traditional principles of contract law.

The fundamental principles of contract law applicable to a tenured professor's claim for breach of contract were explained in our recent decision in *Murphy v. Duquesne University*, 565 Pa. 571, 777 A.2d 418 (2001).[14] In *Murphy*, the tenured professor had been terminated from his employment

14. We note that the Superior Court did not have the benefit of our analysis in *Murphy* as our decision was issued after the court's memorandum opinion in this case.

with Duquesne University after the University's president determined that the professor had engaged in serious misconduct. The professor sued the University for breach of his tenure contract. The University filed a motion for summary judgment that was granted by the common pleas court and affirmed on appeal. We granted allocatur to determine the applicable standard of review from the grant of summary judgment in a contract action involving judicial review of internal university decisions.

The tenured status of the professor was provided for by contract. Pursuant to the faculty handbook issued by Duquesne University, the professor was entitled, as a tenured faculty member, to renewal of his employment until he reached age 70 or retired. Under the University's 1985 Statutes, which were incorporated into the faculty handbook, a professor could forfeit his tenure by serious misconduct or for professional incompetence. Specified procedures were required to be followed before a professor's employment could be terminated.

After investigation, the University's affirmative action officer informed its president that allegations that the professor had violated its policy prohibiting sexual harassment had been substantiated. The president accepted the findings and conclusions submitted by the affirmative action officer. The professor was given a suspension for that violation. The president directed the professor to seek professional counseling and warned him that the University would take immediate action if information of additional or similar past misbehavior came to light. The professor accepted the terms of the suspension.

After the professor returned to teaching, the University was advised that he had engaged in other incidents of sexual harassment. The president then informed the professor that the University would seek to terminate his employment and advised him of his entitlement to a hearing before the University Grievance Committee for Faculty. Following a termination hearing, the committee submitted a report with its findings, recommendations and conclusions. The committee

made several findings unfavorable to the professor, but recommended that his employment not be terminated because the University had knowledge of much of the information about the professor's conduct when he was originally suspended.

Under the terms of the faculty handbook, the authority to terminate a tenured professor's employment was vested in the University's president. The president advised the committee that he did not agree with its process concerns and had concluded that there were more than sufficient grounds to support the finding of serious misconduct and termination of the professor's employment. As permitted under their agreement, the professor appealed the decision to the University's Board of Directors. The Board of Directors determined that the president had the authority to terminate the professor's employment and accepted the conclusions and final decision of the president.

In common pleas court, the professor asserted a breach of contract claim against the University. He asserted that the University's termination of his employment violated his employment contract because he was not engaged in serious misconduct and because he did not receive the process of tenure termination promised under the contract. On appeal from the trial court's grant of the University's summary judgment motion, the Superior Court articulated a limited standard of review of internal university decisions.

We determined that the deferential approach applied by the Superior Court was not the appropriate standard of review. We concluded that the appropriate standard of review was the traditional standard applied by the Pennsylvania courts in determining whether summary judgment was properly granted in a breach of contract case. We stated:

> From our perspective, this is a breach of contract case between two parties, in which the issues raised are no different from those the Pennsylvania judiciary has typically adjudicated when presented with allegations of a contract's breach. Although one of the parties to this dispute is an institution of higher learning, we see no need or reason to

devise special rules for restricting review. This is so because private parties, including religious or educational institutions, may draft employment contracts which restrict review of professional employees' qualifications to an internal process that, if conducted in good faith, is final within the institution and precludes or prohibits review in a court of law. * * * When a contract so specifies, generally applicable principles of contract law will suffice to insulate the institution's internal, private decisions from judicial review.

*Id.* at 428–429.

Having made this determination, we turned to the issue raised by the professor as to whether the University breached its contract of employment when it determined that he had forfeited his tenure. The professor asserted that there was a genuine issue as to whether his behavior rose to the level of serious misconduct that should have been submitted to a factfinder. The University maintained that the right to determine whether a professor was guilty of serious misconduct remained with the chief executive officer of the University under the employment contract.

We recognized that "no two systems of tenure are alike" and that the practices and policies of universities were widely varied. *Id.* at 430. The rights and obligations of a tenured professor and a university require, therefore, an examination of the actual terms of the employment agreement at issue. We applied the well-established principles of contract law that guide a court's interpretation of such employment agreements.

The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties. The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself. The whole instrument must be taken together in arriving at contractual intent. Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed. "When a writing is clear

and unequivocal, its meaning must be determined by its contents alone."

Only where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties. A contract contains an ambiguity "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." This question, however, is not resolved in a vacuum. Instead, "contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." In the absence of an ambiguity, the plain meaning of an agreement will be enforced. The meaning of an unambiguous written instrument presents a question of law for resolution by the court.

*Id.* at 429–430 (citations omitted).

We found that the language of the provisions in the faculty handbook regarding tenure were unambiguous. The provisions stated that a faculty member's tenure could be forfeited for reasons of serious misconduct and professional incompetence. Under the following provisions, the committee would make the recommendation to the University's president, but the authority to make the final decision with regard to termination was vested in the president.

If the committee's recommendation is that the faculty member should not be terminated and the President concurs, the case shall be closed. If the committee's recommendation is that the faculty member be terminated and the President disagrees with that recommendation, the case shall be closed. If the President terminates the affected faculty member either by approval of the committee's recommendation or by his/her own decision, following a committee recommendation of retention, the affected faculty member may have the final decision of the President reviewed by the Board of Directors.

*Id.* at 432. We concluded that the determination of whether a tenured professor's employment should be terminated for serious misconduct was reserved to the University and its faculty.

We observed that a breach of contract claim may be brought by a tenured professor when it is asserted that the University failed to comply with the procedures established by the parties' contractual agreement. This cause of action is distinguishable from a tenured professor's claim that a university that has followed the established procedures for termination has made the wrong decision. We stated that "while [a professor] is free to assert in a court of law that the process of forfeiture that was afforded him did not comply with the [c]ontract's terms, he is not free to demand that a jury reconsider and re-decide the merits of his termination." *Id.* at 433; *see also, Baker v. Lafayette College,* 516 Pa. 291, 532 A.2d 399, 403 (1987) ("This Court has no jurisdiction to review the factual determinations of a college's governing body unless it can be clearly demonstrated that that body violated its own procedures.").

 Appellees argue that, regardless of whether the University may be held liable nominally for breaching its contractual relationship with Dr. Ferrer, an award of damages is unwarranted since Dr. Ferrer was unable to establish that the breach caused him tangible, economic harm. "[I]n the law of contracts remedies for breach are designed to protect either a party's expectation interest 'by attempting to put him in as good a position as he would have been had the contract been performed, that is, had there been no breach'; his reliance interest 'by attempting to put him back in the position in which he would have been had the contract not been made'; or his restitution interest 'by requiring the other party to disgorge the benefit he has received by returning it to the party who conferred it.' " *Trosky v. Civil Serv. Comm'n,* 539 Pa. 356, 652 A.2d 813, 817 (1995) (citing Restatement (Second) of Contracts, Section 344, Comment a).

Section 344 of the Restatement (Second) of Contracts provides, in relevant part:

Judicial remedies under the rules stated in this Restatement serve to protect one or more of the following interests of a promisee:

(a) his "expectation interest," which is his interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed[.]

The official comments to Section 344 address the concept of "expectation interest" as follows:

a. *Three interests.* The law of contract remedies implements the policy in favor of allowing individuals to order their own affairs by making legally enforceable promises. Ordinarily, when a court concludes that there has been a breach of contract, it enforces the broken promise by protecting the expectation that the injured party had when he made the contract. It does this by attempting to put him in as good a position as he would have been had the contract been performed, that is, had there been no breach. The interest protected in this way is called the "expectation interest." It is sometimes said to give the injured party the "benefit of the bargain."

Restatement (Second) of Contracts § 344, comment a. In this case, Dr. Ferrer sought damages that would place him in as good a position as he would have been had the employment agreement not been breached by the University.

■ "Where one party to a contract without any legal justification, breaches the contract, the other party is entitled to recover, unless the contract provided otherwise, whatever damages he suffered, provided (1) they were such as would naturally and ordinarily result from the breach, or (2) they were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and (3) they can be proved with reasonable certainty." *Taylor v. Kaufhold*, 368 Pa. 538, 84 A.2d 347, 351 (1951) (citations and emphasis omitted).

In this case, Dr. Ferrer introduced evidence regarding the damages that he sustained as a result of the loss of the personnel, supplies, equipment and animals that were involved in the research program when the sanctions were imposed. Dr. Frederick Murphy testified as an expert witness regarding the costs of rebuilding the basic components of the re-

search program.[15] Dr. Murphy reviewed the status of the research program as it existed in 1990 to determine what it would take to restore certain components of the program back into place.

Dr. Murphy testified that, in 1990, Dr. Ferrer's program had been running for twenty years and had become "the world's premiere laboratory dealing with bovine leukemia virus." R. 808a. He explained that the first human leukemia virus was discovered in the United States and Japan in 1980, and that the human leukemia virus turned out to be a very close relative of the bovine leukemia virus. Researchers studying the human leukemia virus began to track what the researchers who studied the animal leukemia virus had done. This put Dr. Ferrer's laboratory "into the front row in regard to working with the first human leukemia virus, the first human cancer virus, HTLV–I." As a result, by 1990, Dr. Ferrer's program had shifted to try to take advantage of what was known about the bovine leukemia virus to learn what one needed to know about the human virus. R. 809a.

The program had the herd of cattle that had been specially selected because the animals all carried "a high load of the bovine virus." Simultaneously, the original work to characterize the bovine virus had been done in Dr. Ferrer's laboratory. The group that he assembled then began to work on the human leukemia virus. Dr. Murphy described the program as "a world class laboratory, extremely productive." R. 810a.

Dr. Murphy identified the costs for reestablishing the research program and provided a chart that set forth a budget-

15. Dr. Murphy was a Doctor of Veterinary Medicine who was trained and experienced in virology, immunology and pathology. R. 789a. He had served with the Center for Disease Control (CDC), where he was one of four people who discovered the Ebola virus. He became director of its viral division, with responsibility for a budget of $20 million per year. During that time, a research program involving twenty-four people was developed to study HTLV–I and HIV. He was subsequently promoted to Director of the National Center for Infectious Diseases, overseeing a budget of $150 million per year and 2,000 people. Dr. Murphy had spent the seven years prior to trial as a professor at the University of California, five of which he served as dean. R. 788a–793a.

ary itemization of those costs. Dr. Murphy detailed the nature and extent of the costs, analyzing each component of the salaries and fringe benefits of research personnel, laboratory equipment, supplies, and the purchase and maintenance of the animals. R. 814a–821a. Dr. Murphy testified that, based upon this itemization of laboratory related expenses, personnel costs, and expenditures related to animals, it would cost $2.9 million to begin to rebuild Dr. Ferrer's research program.

"The duty of assessing damages is within the province of the jury and should not be interfered with by the court, unless it clearly appears that the amount awarded resulted from caprice, prejudice, partiality, corruption or some other improper influence." *Tonik v. Apex Garages, Inc.*, 442 Pa. 373, 275 A.2d 296, 299 (1971) (citation omitted). "In reviewing the award of damages, the appellate courts should give deference to the decisions of the trier of fact who is usually in a superior position to appraise and weigh the evidence." *Delahanty v. First Pennsylvania Bank*, 318 Pa.Super. 90, 464 A.2d 1243, 1257 (1983).

The trial court refused to disturb the jury's award of damages in this case, stating that

[t]he jury reasonably concluded, based on the amount of time and effort Dr. Ferrer contributed to develop his research program, as well as the money necessary to begin rebuilding the program, that $5 million was the amount necessary to make Dr. Ferrer's research program "whole" again. The jury's award of damages in the amount of five million dollars ($5,000,000) is neither plainly excessive or exorbitant.

Trial court slip op. at 7.

On this record, we have little difficulty accepting that the contractual breach discerned by the jury caused Dr. Ferrer to sustain substantial lost opportunity. This was largely conceded by Appellees in the Superior Court, where they accepted that "[u]nder plaintiff's theory, [Dr. Ferrer] may have lost the opportunity or 'expectation' of continued research because

his laboratory was no longer viable. . . ." In our view, the more difficult questions are whether Dr. Ferrer was able to prove the amount of his loss with sufficient definiteness to meet the requirements of the law, and, correspondingly, whether the jury's verdict reflects a permissible damages assessment. Appellees, however, expressly distinguish the legal theory under which they have proceeded and on which they prevailed in the Superior Court (asserted absence of loss causation) from a claim that the damages were impermissibly speculative. See, e.g., Brief for Appellees at 11 n. 7 ("It is important not to confuse this element [of causation] with the issue of the certainty with which the *amount* of damages must be proven." (emphasis in original)). While this distinction may be a tenuous one given the interrelationship between causation and damages, as challengers to a duly rendered verdict, Appellees bore the burden of framing the issues for appellate review.

We note, however, that the Appellees presented a separate and specific claim in the trial court and Superior Court that the damage award of $5,000,000 was arbitrary, excessive, and not supported by the evidence. The Appellees' argument is predicated on its assertion that the testimony of Dr. Ferrer's expert witness effectively established an outside boundary of $2,900,000 for the value of the loss.[16] On review of the record, we find merit to this claim and, accordingly, award the Appellees' request for remittitur. The verdict will be reduced to $2,900,000, and we will remand this matter to the common pleas court for recalculation of prejudgment interest as warranted on the judgment as so modified.

We must next address the issue of whether the Superior Court erred in finding that the trial court's instructions to the

16. In their Superior Court brief, Appellees did also indicate that "the $2.9 million amount was open to substantial question", however, other than by way of citation to the reproduced record, this contention was not further developed in the brief as such. Rather, the argumentation directed to excessiveness proceeded on the assumption that the evidence was sufficient to support a 2.9 million dollar award. In these circumstances, we consider Appellees' argument preserved only to the latter point. Accord Madison Constr. Co. v. Harleysville Ins. Co., 557 Pa. 595, 735 A.2d 100, 109 n. 8 (1999) ("So minimal an argument on so important an issue does not warrant further review.").

jury were inadequate. The court concluded that it would have awarded a new trial to the Appellees because the trial court's jury instructions regarding damages were improper. Dr. Ferrer asserts that the instructions proposed by the Appellees were not supported by citation to any legal authority and requested the trial court to provide the jury with one-sided statements of fact and misstatements of the law. He contends that the trial court's charge was consistent with the standard Pennsylvania Jury Instructions (Civil).

When examining jury instructions, we must determine whether the trial court committed a clear abuse of discretion or error of law controlling the outcome of the case. *Stewart v. Motts*, 539 Pa. 596, 654 A.2d 535 (1995). It is only when "the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue" that error in a charge will be found to be a sufficient basis for the award of a new trial. *Id.* at 540. We explained that

[a] charge will be found adequate unless "the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said or unless there is an omission in the charge which amounts to fundamental error." *Voitasef-ski v. Pittsburgh Rys. Co.*, 363 Pa. 220, 226, 69 A.2d 370, 373 (1949)[.] A reviewing court will not grant a new trial on the ground of inadequacy of the charge unless there is a prejudicial omission of something basic or fundamental. *Sweeny v. Bonafiglia*, 403 Pa. 217, 221, 169 A.2d 292, 293 (1961); *Giorgianni v. DiSanzo*, 392 Pa. 350, 356, 140 A.2d 802, 805 (1958). In reviewing a trial court's charge to the jury, we must not take the challenged words or passage out of context of the whole of the charge, but must look to the charge in its entirety. *McCay v. Philadelphia Electric Company*, 447 Pa. 490, 499, 291 A.2d 759, 763 (1972).

*Id.*

Upon review of the trial court's instructions to the jury in this case, and the Appellees' requested jury instructions, we conclude that the Superior Court erred in finding that the jury

instructions were insufficient and would warrant a new trial. Viewed in its entirety, the trial court's charge to the jury adequately explained to the jury the traditional principles of contract law governing a claim for breach of an employment agreement, the nature and measure of the damages that are recoverable, the applicable burdens of proof to establish a breach of contract and for damages, the considerations in assessing the testimony of witnesses, including expert witnesses, the qualifications of experts and the consideration of expert testimony based upon hypothetical questions. R. 1327a–1350a. There was no fundamental omission or error in the trial court's instructions to the jury that would require a new trial.

We find that the trial court properly rejected the Appellees' requested points for charge because they were either already covered by the instructions that were given to the jury or were argumentative. R. 1952a, 1960a. The purpose of the court's charge is to provide guidance to the jury on the relevant legal issues arising from the claims before the jury. The instructions to the jury are not intended to supplement the arguments of the opposing parties. This is the function of the attorneys who represent the parties, not the court.

We note that the Appellees did not claim that the trial court's instructions were not in accordance with the well-established principles of law governing a claim for breach of contract, including the proper measure of damages. Instead, the Appellees argued that the jury was not adequately apprised of the findings necessary in order to award damages and the essential elements necessary to calculate the award. We find, however, that the Appellees' requested instructions regarding damages were unsupported by authority and contrary to legal precedent.

As part of its defense, the Appellees sought to persuade the jury that, even if a breach of Dr. Ferrer's employment contract had been established, Dr. Ferrer did not suffer any damages as a result of the dismantling of his research

program. The Appellees requested that the jury be instructed that Dr. Ferrer was entitled to damages for breach of contract only if he proved by a preponderance of the evidence that he lost personal income or his own personal property, and that to the extent that damages were recoverable for expenses to cover the hiring of personnel and the purchase and maintenance of animals and equipment, that only the amount of money that was necessary to allow the plaintiff to re-establish his program was to be awarded.[17] The Superior Court found that the trial court erred in refusing to give such instructions. We disagree.

The trial court did not err in refusing to give the requested instructions. The evidence introduced at trial demonstrated that Dr. Ferrer's research program was an established program, not a fledgling research project. The proposed instructions would have improperly limited the nature and scope of damages that the law recognizes for breach of contract claims. The jury was permitted to weigh the evidence regarding damages to determine what award was necessary to restore Dr. Ferrer to the position that he would have been in had the University complied with its obligations under the employment agreement.

The Appellees also requested numerous jury instructions that would have informed the jury that it could not find that the imposition of sanctions by Dean Andrews was a breach of Dr. Ferrer's employment contract.[18] Such instruc-

17. The Appellees sought to persuade the jury that Dr. Ferrer had not sustained the damages that he claimed because his personal funds were not used to finance the research program. This argument was rejected by the jury. The jury was free to reject the Appellees' argument as the evidence established that the monies obtained to finance the research program were generated by Dr. Ferrer's efforts. Dr. Ferrer expended his time and energy to develop research proposals to generate the funds necessary to support the program, including his own salary. The research emanated from his scientific training and knowledge, which was continually developing based upon his ongoing efforts. To accept the Appellees' argument, the jury would have had to disregard the substantial evidence of Dr. Ferrer's personal contribution of his talents and energies that established the program. The jury chose not to do so.

18. For example, the Appellees requested instructions that "[t]he mere fact that sanctions were imposed is not evidence of a breach of

tions would have been improper as the evidence was sufficient to submit to the jury the issues of whether the Procedures were part of Dr. Ferrer's employment contract with the University, whether there was a breach of the employment contract as a result of the sanctions, and whether he was harmed by a breach of the agreement. The Appellees were entitled to, and did, present evidence as a defense that they believed there was unwritten authority for a dean to impose sanctions when a formal investigative committee has found that a tenured professor was not guilty of misconduct in research.[19] They were not entitled, however, to jury instructions that would have misled the jury into believing that imposition of the sanctions could not constitute a breach of Dr. Ferrer's employment agreement.[20] We conclude, therefore, that the Superior Court erred in finding that a new trial should have been awarded to the Appellees if their motion for judgment n.o.v. not been granted.

Accordingly, the order of the Superior Court is reversed. The jury verdict in favor of Dr. Ferrer is reinstated, the award of damages is reduced to $2,900,000 plus prejudgment interest, and the matter is remanded to the common pleas court for recalculation of the amount of prejudgment interest. This Order is without prejudice to any separate pending appeal concerning the matter of prejudgment interest.

contract. Plaintiff must prove to you that, under all of the circumstances, the defendants imposed sanctions that had no basis whatsoever and that were imposed for entirely irrational and illogical purposes, and were done in bad faith." The Appellees cited no authority for this proposition or for any of the other requested points for charge.

19. The jury verdict form reflects that the Appellees' defense of inherent unwritten authority of a dean to impose such sanctions was rejected outright by the jury.

20. The Appellees' proposed instructions on causation also would have required the trial court to misstate the nature of Dr. Ferrer's claim and the applicable law. Dr. Ferrer was seeking to recover damages for the interruption in his ability to perform the research to which he had devoted his professional career. As detailed above, he presented evidence of the cost of rebuilding his research program as well as the loss occasioned by the Appellees' interference with his ability to perform his research.

Justice NIGRO did not participate in the consideration or decision of this case.

Former Chief Justice FLAHERTY did not participate in the decision of this case.

Dissenting opinions of Justice CAPPY and Madame Justice NEWMAN to follow.

CAPPY *, Justice, dissenting.

In my view, the majority opinion effects a dramatic and ill-advised change in Pennsylvania's law of contracts relating to damages. Because it is a change that I cannot accept, I must respectfully dissent.

I begin with my understanding of Appellant's case. Appellant's sole theory of recovery sounded in contract, and focused on the nature of the sanctions that Appellees (collectively, "the Trustees") imposed upon him.[1] Paragraph 64 in Appellant's complaint, which was the only allegation that proceeded to trial, stated:

> 64. Even if [the Trustees] had the authority to impose some sanction against [Appellant], the sanctions imposed were so excessive and arbitrary when measured against the conduct and previous record of [Appellant] that said defendants breached their duties as set forth in the *Procedures*.[2]

(Complaint at ¶ 64).

According to Appellant, the sanctions that the Trustees imposed upon him caused him to lose the ability to perform scientific research,[3] and the damages he requested were to

---

* The author of the Dissenting Opinion is now Mr. Chief Justice Cappy.

1. While Appellant's complaint set forth claims for intentional interference with business relations, breach of contract, intentional infliction of emotional distress, defamation, and conspiracy, except for paragraph 64 in his breach of contract count, all of Appellant's claims were either voluntarily withdrawn or dismissed as untimely.

2. I agree with the majority that Appellant proved that the Trustees breached this promise.

3. In Appellant's own words: "Although it was undisputed that [Appellant] did not lose salary or fringe benefits as a result of [the Trustees'] unauthorized and improper sanctions, *[he] lost something far more*

protect his expectation interest under Section 344 of the Restatement (Second) of Contracts. The only evidence which Appellant submitted on damages was expert evidence to show that the particular research program in which he was involved as a University of Pennsylvania professor would cost $2.9 million to re-establish. The jury awarded Appellant the $2.9 million and more. This award of the research program to Appellant is what the majority upholds, although it reduces the amount of that reward to the $2.9 million figure that Appellant's expert opined would be necessary if the program were to be restored.

The expectation interest is indeed protected in Pennsylvania. *Trosky v. Civil Serv., Comm'n*, 539 Pa. 356, 652 A.2d 813, 817 (1995) (citing Restatement (Second) of Contracts § 344 cmt. a). The premise of the expectation interest as it currently stands in Pennsylvania jurisprudence is clear. It endeavors to put a promisee in as good a position as he would have been in, had he received what he was promised. *Id.*

The Trustees assert, *inter alia*, that the Superior Court's decision to enter judgment in their favor must be upheld because Appellant did not show that he himself suffered any financial loss as a result of the breach of contract. That is to say, Appellant's proof on damages, did not, as the expectation interest requires, show the position he would have been in financially had the Trustees performed their obligations. I agree. Simply stated, Appellant's proof on damages is inconsistent with his expectation interest because Appellant's financial position would not have included the research program's value and Appellant would not have been $2.9 million richer, even if the Trustees had refrained from imposing excessive and arbitrary sanctions upon him.

To me, it is self-evident that the law of contracts protects the economic expectations of parties to a contract and redresses the economic injuries that a contracting party suffers as a consequence of the contract's breach. *See* John E. Murray,

---

precious and valuable to him: the ability to perform important, if not vital scientific research...." (Appellant's Brief at 30) (emphasis in original).

Jr., *Grismore on Contracts*, § 195 (Rev. ed. 1965) ("Inasmuch as the promisee in a contract is primarily entitled to have performance, if he cannot get it, the law endeavors to put him, as nearly as it can, in as good a position *financially* as he would have been in, had he received what he was promised.") (emphasis added).

Therefore, when I assess Appellant's theory of recovery and the propriety of the jury's award under the expectation interest, I ask a straightforward question: if Appellant had received what the parties' contract promised him, would his economic position have included the research program or its worth? I can only answer this question in the negative. My reasons are two-fold. First, the parties' contract, as Appellant set it forth in paragraph 64 of his complaint, did not include a promise that the research program would be his. Second, the undisputed facts of record establish that Appellant had no ownership or other legally-recognized interest in the research program, its underlying funding or in its components, nor did he expect to be given or gain such an interest under the parties' agreement.[4] In other words, Appellant did not lose the research program or its value due to the Trustees' breach, and would not have acquired it, even if the Trustees had fulfilled their contractual obligation. Thus, Appellant's award does not place him in the financial position he would have been in had the Trustees performed. Rather, by giving him the monetary equivalent of the research program, the award put him in a much better financial situation.

In my view, therefore, Appellant's award runs contrary to the expectation interest as the law of contracts defines it. Accordingly, Appellant failed to satisfy his burden on dam-

---

4. Appellant's expert, Frederick Murphy M.D., confirmed that the research program did not belong to Appellant, and never would have belonged to him. Dr. Murphy testified that the grant money that purchased all of the items that constituted the research program in which Appellant worked-the animals, supplies, personnel and equipment—was given to the University of Pennsylvania and placed into a segregated university account. (N.T. 12/4/98 at 158–160). In this context, therefore, the majority's repeated references to "Dr. Ferrer's research program; "his research staff"; and "his animal colonies" are incorrect and misleading. *See, e.g.*, Majority Opinion at 604, 606, 611.

ages, an essential element of his case, *see Spang & Co. v. U.S. Steel Corp.*, 519 Pa. 14, 545 A.2d 861, 866 (1988), and a judgment in the Trustees' favor is warranted, notwithstanding the jury's verdict.[5]

Recalling Appellant's description of what he lost as a result of the Trustees' breach, i.e., his ability to conduct research, Appellant should have presented evidence of the value of what would have accrued to his economic well-being because he had the opportunity to work in the research program. For example, had Appellant offered expert testimony to the effect that by virtue of his continuing research, he could have secured a higher salary at another institution or some other personal financial gain, he might have established the damages element of his case. If no such proof were available, or if compensatory damages were inadequate, Appellant could have pursued injunctive relief, to enjoin the Trustees from imposing the sanctions. *See Rogoff v. Buncher Co.*, 395 Pa. 477, 151 A.2d 83, 86 (1959).

I submit that the majority's decision to uphold the jury's award to Appellant, which disregards the traditional underpinnings of the expectation interest, is unprecedented, and will alter substantially the rights and liabilities which flow between plaintiffs and defendants in Pennsylvania in breach of contract actions. In my view, the majority opinion will work an injustice in many cases. Accordingly, I dissent, and would affirm the Superior Court's memorandum opinion and order, reversing the trial court, and concluding that judgment should be entered in the Trustees' favor.[6]

**5.** I do not disagree with the majority opinion's discussion of an appellate court's standard of review when confronted with a motion for j.n.o.v., as far as it goes. (Majority Opinion at 595). I would add, however, that judgment n.o.v. may be entered if the movant is entitled to a judgment as a matter of law. *Boettger v. Miklich*, 534 Pa. 581, 633 A.2d 1146, 1148 n. 2 (1993). When deciding a question of law, this court's review is de novo and its scope of review is plenary. *Buffalo Township v. Jones*, 571 Pa. 637, 813 A.2d 659, 664 n. 4 (2002).

**6.** I read pages 9 through 11 of the Superior Court's memorandum opinion as voicing the conclusion that the jury's award cannot stand because it did not fall within Appellant's expectation interest insofar as

Appellant had no economic interest in the research program's funding or that which it bought.