CONDOMINIUM ASSOCIATION COURT OF OLD SWEDES, Appellant

v.

Emily STEIN–O'BRIEN

Charles P. O'Brien.

Commonwealth Court of Pennsylvania.

Argued Nov. 11, 2008.

Decided June 8, 2009.

Roger F. Perry, Philadelphia, for appellant.

Thomas W. Harrity, Philadelphia, for appellees.

BEFORE: SMITH–RIBNER, Judge, LEAVITT, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge LEAVITT.

The Association of the Condominium at the Court at Old Swedes (Association) appeals two orders of the Court of Common Pleas of Philadelphia County (trial court) that denied the Association's motion for a new trial and imposed delay damages on the jury's breach of contract verdict rendered in favor of Emily Stein–O'Brien and Charles P. O'Brien.[1] The gravamen of the Association's appeal is that it cannot be held contractually liable for lost rental income and for extensive damage to Stein–O'Brien's condominium unit when she waited five years to mitigate her damages. Concluding that the trial court erred in directing a liability verdict against the Association and in other critical rulings, we vacate and remand for a new trial.

Stein–O'Brien owns two adjoining condominium units in the Court at Old Swedes. The instant appeal concerns one of those properties, Unit 29, which Stein–O'Brien rented out to others from 1992 to 2000.

In 2004, a dispute arose between the Association and Stein–O'Brien over the non-payment of her condominium fees. The Philadelphia Municipal Court entered a judgment against Stein–O'Brien, and she appealed. The Association then filed a complaint in the trial court, seeking to recover Stein–O'Brien's unpaid condominium fees. She counterclaimed in assumpsit, asserting that the Association had breached its contractual obligation to maintain the condominium common elements, including the roof over Unit 29. The matter proceeded to arbitration, which concluded in an award to the Association of $14,410 and an award to Stein–O'Brien of $20,000. The Association appealed the arbitration, and the matter proceeded to a jury trial.

At trial, Stein–O'Brien asserted that the Association breached its contractual obligation to maintain the roof over Unit 29.

---

1. Although Charles O'Brien is a title owner of Unit 29, he is out of the country and had no involvement in the litigation. Accordingly, this opinion will hereafter refer only to Stein–O'Brien.

The Association did not deny that this roof, which covered the top of a long line of adjoining condominium units, was a "common element" that was the responsibility of the Association. However, the Association contended that Stein–O'Brien had responsibility for maintaining the air-conditioning platform, which was constructed on top of the roof, and that this air-conditioning platform, not the roof, caused the damage to Unit 29. The Association also contended that the interior damage to Unit 29 was caused by problems with Unit 29's patio and deck,[2] which were the maintenance responsibility of Stein–O'Brien, not the Association.

In support of her position, Stein–O'Brien testified that water began leaking into Unit 29 in 1999. It began with a leak in the small bedroom on the top floor of the unit under the common element roof and then spread. Stein–O'Brien spoke to the Association's president and other officers about the problem, and they sent someone up to the roof to evaluate the problem, she believed. For example, she stated that in 2004, someone cut a hole in the roof above the small bedroom, but that hole was not fixed.[3] Stein–O'Brien stated that she undertook "numerous, numerous repairs" herself and hired a handyman, Keith Carrington, to make repairs, which he did between 2000 and 2005. Reproduced Record at 115a (R.R. ——). However, Carrington's repairs did not arrest the water problem.

In July 2004, Stein–O'Brien sent a letter to the Association complaining about the condition of the roof around the air-conditioning platform. The letter stated that if she did not receive a satisfactory response, she would do repairs herself.[4] Stein–O'Brien believed, when she wrote the letter, that the air-conditioning platform was the Association's responsibility to maintain. Stein–O'Brien's letter did not suggest that the entire roof needed attention.

In July 2005, Joseph Hannigan, a home remodeler, replaced the roof over Unit 29, and this stopped the leaks coming into Unit 29 from the roof. However, water has continued to leak into a second-floor bedroom under the third floor deck. Stein–O'Brien testified that the deck was the Association's responsibility because it

---

**2.** Both parties refer to a "roof deck" which is presumably the "upper deck" described in Section 6(a) of the Condominium at Old Swedes Enabling Declaration as being part of the upper unit. Reproduced Record at 210a.

**3.** Stein–O'Brien's testimony about what was done to the roof in 2004 is unclear.

**4.** Specifically, in her letter Stein–O'Brien stated in relevant part:

[A]fter five years of a continually leaking roof, I feel I have been more than patient with the condominium association attempts to respond to my problems. Having made numerous endeavors through the last five years to employ the association to stop the water from ruining my units and after speaking with you in which you asked if I had done anything to stop the leakage; I felt it had become necessary to make repairs to stop the damage. It had become quite clear that the condominium association timeliness and ineptness in making the necessary repairs was costing me a great deal of money. Thus with the dues from May and June [2004], I hired a person and made repairs to those outside problems on the included photos. I am enclosing a check for July's condo fees and am still in need of the following items to be taken care of by the association:
1. Roof repaired around air condition Unit 29
2. Gutters leveled to drain properly into downspouts Unit 29
3. Drain in sidewalk opened in front of Unit 29
4. Sidewalk repaired so that water does not pool in front of entrance gate to Unit 30
5. Window leaks in dining room Unit 30.
R.R. 287a.

had paid for flood insurance to cover damage to lower unit decks and had, in the past, accepted responsibility for maintaining decks and patios. Stein–O'Brien acknowledged that there was nothing in the written contract that required the Association to maintain the decks of Unit 29. Nevertheless, she believed the Association minutes would record the Association's agreement to maintain the decks. She did not, however, offer those minutes into evidence.

Stein–O'Brien testified about the expenses she incurred as a result of the various leaks, and she offered several documents to corroborate those expenses. These documents included receipts from Lowe's and Home Depot that, according to Stein–O'Brien, were for materials used to repair Unit 29. Another document was her hand-written list recording a series of $200 cash payments, and their dates, that she made to Keith Carrington. The payments were made from September 2000 to October 2005 and totaled $14,400. Stein–O'Brien was unable to correspond a particular repair to a particular $200 payment, but she stated that they all addressed water problems in Unit 29. With respect to future repairs needed in Unit 29, Stein–O'Brien testified that she had received an estimate from James Lesher for various work to the interior of Unit 29, an estimate from Hannigan for work to the deck and, finally, an estimate from John Neill to repaint the entire unit.

Stein–O'Brien then testified about her lost rental income. Stein–O'Brien explained that in 1998 she entered into a two-year lease for Unit 29 at a rent of $1,500 per month. In May 2000, she released the Unit 29 tenants from their lease because one of them was getting married. She then started using Unit 29 to store her furniture and has not rented the unit since. At different times since May 2000, prospective tenants have approached her about Unit 29, and one such individual offered her $2,500 in monthly rent. However, Stein–O'Brien refused to rent Unit 29 in its "slum conditions," stating that "until I rectified the problem with the water, I was not willing to take the liability on of ruining someone else's possessions with water damage, and so I would not place someone in there." R.R. 141a–142a.[5] Stein–O'Brien requested damages for lost rental income in the amount of $174,000. At no point prior to trial did Stein–O'Brien inform the Association that she believed it was responsible for her lost rental income.

Joseph Hannigan testified about the condition of the sloped roof over Unit 29 and the repairs he made to it.[6] When Hannigan pulled up the roof shingles he saw numerous places where there had been water damage and observed that prior, unsuccessful repairs had been attempted. Hannigan found the air-conditioning platform to be rotting. When Hannigan removed the shingles placed over the bottom of the platform, he found rotted plywood. Hannigan replaced this rotted plywood as well as plywood in several other spots before he reshingled the entire roof. He also replaced the air-conditioning platform. The total cost of Hannigan's work was $10,110. He gave Stein–O'Brien an estimate of $3,200 to replace the third floor deck, which still needs to be done.

**5.** Stein–O'Brien has been able to rent out her other smaller unit, Unit 30, for $1,800 per month.

**6.** Only parts of the trial transcripts are included in the certified record and large portions of testimony are missing, including the major-

ity of Hannigan's testimony from the trial. The record does, however, contain deposition testimony Hannigan gave in December 2005. Certified Record Exhibit U. Therefore, we summarize that testimony.

Association president, Dan Grasso, testified that in 1999, he notified the condominium owners in writing that they were responsible for the repair and maintenance of their air-conditioning platforms. In each unit, wires from the air-conditioning unit pass down through the roof to the utility room below. Grasso testified that the air-conditioning platform is not part of the roof; rather, it is a separate structure that is the responsibility of the unit owner. In support, he referenced the Code of Regulations and the Declaration of the Condominium at the Court at Old Swedes, which were admitted as the operative contract writings.

At the close of the evidence, the trial court directed a verdict in favor of Stein–O'Brien on her contract claim for direct and consequential damages, finding that her losses were all caused by the "defective roof;" the court also awarded her attorney's fees. R.R. 193a–194a. On the other hand, the trial court directed a verdict in favor of the Association on Stein–O'Brien's unpaid condominium fees and its attorney's fees. The trial court directed the jury to determine the amount of damages and attorney's fees owed by the Association to Stein–O'Brien, as well as the amount she owed the Association.

The jury awarded the Association $12,000 on its claim for unpaid condominium fees and $0 for its attorney's fees and costs. The jury awarded Stein–O'Brien $32,000 for past damages to Unit 29; $213,000 for consequential damages (lost rental income); $28,000 for future damages; and $19,808.44 for attorney's fees and costs for a total award of $292,808.44.

The Association filed a motion for post trial relief, requesting a new trial; judgment n.o.v. on the issue of damages; and a remittitur. Its motion was denied. Stein–O'Brien filed a petition for delay damages, and it was granted. The trial court then molded the jury award to add delay damages in the amount of $30,012.14. The trial court reduced Stein–O'Brien's award by the $12,000 in condominium fees, which she owed the Association, for a total net verdict of $310,820.58. The Association appealed to this Court.

Before this Court, the Association again seeks a new trial,[7] contending that the trial court erred or abused its discretion in numerous ways. Specifically, the Association asserts that the trial court erred: by admitting irrelevant or unauthenticated documents and testimony; by failing to distinguish between the maintenance of the common elements, which are the contractual responsibility of the Association, and maintenance of the "title areas," which are the contractual responsibility of the unit owner; by finding, as fact, that Unit 29's air-conditioning platform and deck were themselves part of the roof; by directing a verdict on the Association's contract liability for all damage to Unit 29; and by awarding delay damages in a contract case. The Association contends that the trial court's summary denial of its post-trial motions, without any opportunity for briefing or oral argument, cannot be sustained. We address these issues *seriatim.*

We consider, first, the Association's challenge to the trial court's directed ver-

---

7. The decision to grant or deny a request for a new trial is committed to the discretion of the trial court. *Fanning v. Davne,* 795 A.2d 388, 393 (Pa.Super.2002). An appellate court may not disturb a trial court's ruling unless the trial court palpably abused its discretion or committed an error of law that controlled the outcome of the case. *Id.* An abuse of discretion is not merely an error of judgment but occurs if, in reaching a conclusion, a law is misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence of record. *Id.*

dict on Stein–O'Brien's contract claim for all the damage to Unit 29, including consequential damages in the form of lost rental income. The Association contends that the directed verdict cannot be reconciled with the terms of the written contract. Specifically, the trial court violated the terms of the contract by lumping together the air-conditioning platform, the patio and the deck as all part of the "roof," when they are treated separately in the contract. In addition, the evidence was conflicting on whether the damage to Unit 29 was caused by the roof, the deck or the patio, and these conflicts should have been resolved by the jury. In response, Stein–O'Brien counters that Hannigan, the only roof expert to testify, stated that the roof over Unit 29 had to be replaced.

■ We begin with a summary of the principles of condominium ownership, which combines individual ownership of the condominium units with common ownership of other areas. "Condominium" is defined in the Uniform Condominium Act as:

> Real estate, portions of which are designated for separate ownership and the remainder of which is designated for common ownership solely by the owners of those portions. Real estate is not a condominium unless the undivided interests in the common elements are vested in the unit owners.

68 Pa.C.S. § 3103.[8] A condominium is created by the filing of a declaration, 68 Pa. C.S. § 3201,[9] and the rules of condominium ownership are governed by the enabling statute, the terms of the condominium declaration, and the condominium association's by-laws, if any. *Lyman v. Boonin,* 535 Pa. 397, 402, 635 A.2d 1029, 1031 (1993). The condominium association is "responsible for maintenance, repair and replacement of the common elements and each unit owner is responsible for maintenance, repair and replacement of his unit." 68 Pa.C.S. § 3307(a). The condominium association collects a monthly assessment from each unit owner to cover that owner's share of the common expenses. The "condominium form of ownership in real estate succeeds, because unit owners agree to cooperate in the maintenance of common elements." *Rivers Edge Condominium Association v. Rere, Inc.,* 390 Pa.Super. 196, 568 A.2d 261, 263 (1990).

Stein–O'Brien's assumpsit claim against the Association is founded upon the Code of Regulations and the Association's Declaration, and as in Section 3307(a) of the Uniform Condominium Act, they divide maintenance responsibilities between the unit owners and the Association. Article VII, Section 2 of the Code of Regulations makes unit owners responsible for the "maintenance and repair" of the "title line" portions of their unit, such as a door. R.R. 261a. On the other hand, Article

8. The Uniform Condominium Act was enacted by the Act of July 2, 1980, P.L. 286, to be effective 120 days from that date. Before that time, condominiums were governed by the Unit Property Act, Act of July 3, 1963, P.L. 196, 68 P.S. §§ 700.101–700.805, repealed by the Act of July 2, 1980, P.L. 286, effective in 120 days. It appears that the condominium in this case may have been created on September 12, 1980, making it subject, at least in part, to the Unit Property Act. However, this does not alter our analysis or the outcome, as Section 3102(a) of the Uniform Condominium

Act, 68 Pa.C.S. § 3102(a), specifically makes contract liability applicable to all condominiums created prior to the Uniform Condominium Act's effective date.

9. It states, in relevant part, as follows:

> A condominium may be created pursuant to this subpart only by recording a declaration executed, in the same manner as a deed, by all persons whose interests in the real estate will be conveyed to unit owners ...
> 68 Pa.C.S. § 3201.

VII, Section 2 of the Code of Regulations makes the Association "responsible for the operation, maintenance, repair, improvement and replacement of the *common elements.*" R.R. 260a (emphasis added).

The Declaration defines what part of the condominium falls within the "title lines" of each unit. It states that "title lines" include:

> (5) the outside surfaces of all doors, door frames, door sills, hinges and trim of such UNIT. *All patios and decks shall be included within the TITLE LINES of each UNIT for the full width and breadth thereof,* and to a height equal to the bottom surface of any part of the BUILDING overhanging such parts or deck or equal to the height of finished ceiling level of the highest interior ceiling in the UNIT to which each such patio or deck is attached, whichever may apply.

Declaration, § 5(c)(5), R.R. 209a (emphasis added). With regard to air-conditioning, Section 5(d) states that the unit owner has responsibility for

> all pipes, ducts, wires, cables, conduits and other electrical[,] plumbing, lighting, telephone, communication, heating, *airconditioning* [,] sewer, water and other systems and equipment or *installations* whether or not within the TITLE LINES of [the unit] but *serving only such unit.*

R.R. 209a (emphasis added). Section 7(c) of the Declaration describes common elements as follows:

> All main structural walls, floors and ceilings (exclusive of the respective parts thereof above expressly included within the TITLE LINES of the UNITS); *roofs and roof assemblies* of the UNITS and the spaces enclosed thereby, foundations, structural parts and supports, as and to the extent that any of the forego-

ing are not specifically, by this DECLA-RATION, included within the UNITS. R.R. 211a (emphasis added).

In sum, the Declaration placed responsibility on Stein–O'Brien for maintenance of Unit 29's decks and patios by specifying that these architectural details fall within the title lines. The Declaration separately addressed the air-conditioning, including its wires and "installation," and made air-conditioning the responsibility of Stein–O'Brien even though the system was placed outside the title lines, *i.e.,* on the roof. On the other hand, the roof is a common element, as acknowledged by the Association, except where a part of a roof or roof assembly is placed by the Declaration "within the unit," such as the air-conditioning. By making the deck and air-conditioning part and parcel of the "roof," the trial court disregarded the language of the contract.

■ Stein–O'Brien testified that the Association had agreed to be responsible for the patios and decks, but the Association correctly pointed out that the terms of a contract cannot be altered by parol evidence. Indeed, when a contract's terms are unambiguous, as they are here, they may not be contradicted by parol evidence in the absence of clear and convincing evidence of fraud, accident or mistake. *In re Estate of Pettenati,* 760 A.2d 1229, 1232 (Pa.Cmwlth.2000). The trial court should have considered only the Declaration and the Code of Regulations to establish the terms of the contractual relationship.

The trial court's directed verdict in favor of Stein–O'Brien cannot stand. The Code of Regulations and Declaration made the maintenance of the patio, deck and air-conditioning platform the responsibility of Stein–O'Brien, not the Association. The trial court seemed to treat this litigation as a breach of warranty of habitability action

brought against a builder. It was not. It was a breach of contract action that turned on the language of the written contract, and the trial court erred by deviating from the terms of that written contract.

■ The trial court committed further error by treating all damage to Unit 29 as caused by the common element roof when there was conflicting evidence on the cause of the leaks. For example, the Association claimed that some of the damage to Unit 29 was caused by the air-conditioning platform, not the roof. This is an issue that had to be sorted out by the jury. The roof is the Association's responsibility, but Stein–O'Brien's evidence did not show that all interior damage to Unit 29 was caused by the roof. Stein–O'Brien herself testified that after the main roof was replaced, water continued to enter into a bedroom below the deck. Where evidence conflicts, it must be resolved by the jury. *Commonwealth v. Diggs*, 597 Pa. 28, 38, 949 A.2d 873, 879 (2008). The jury had to make specific findings about the location of damage and whether it was caused by the roof, the air-conditioning platform or the deck. In short, the trial court erred in directing a verdict in favor of Stein–O'Brien on all damage to Unit 29. It was the jury's job to parse the evidence on the cause of the damage to Unit 29 and determine what was caused by the roof and what was caused by the patio or the air-conditioning platform.

Because we order a new trial, we will not address each of the Association's challenges to other rulings of the trial court. However, we will address some that must be followed on remand.

The single greatest component of the damage award was for lost rental income. The Association argues that Stein–O'Brien is not entitled to such award because she did not mitigate her losses; she did not show that Unit 29 was uninhabitable; and she did not relate the lost rental income to a breach of contract by the Association.

■ Nothing in the Code of Regulations or Declaration suggests that the Association assumed liability for lost rental income to a unit owner. However, Stein–O'Brien argued that she was entitled to this lost income. Consequential damages can be appropriate in a breach of contract case. As this Court has explained:

> [A] party is entitled to recover whatever damages it suffered, provided the damages were such that would naturally and ordinarily result from the breach, or the damages were reasonably foreseeable and within the contemplation of the parties at the time of contracting and can be proved with reasonable certainty.

*James Corporation v. North Allegheny School District*, 938 A.2d 474, 497 (Pa. Cmwlth.2007). Where the consequential damages are "foreseeable" and were contemplated by "the parties at the time they made the contract," they will be awarded in order to put the victim of the contract breach in the same position as if there had been performance, not breach. *Ferrer v. Trustees of the University of Pennsylvania*, 573 Pa. 310, 341, 825 A.2d 591, 610 (2002). However, the party who suffers a loss is under a duty "to make *reasonable* efforts to mitigate" damages. *Appeal of Edge*, 147 Pa.Cmwlth. 27, 606 A.2d 1243, 1246 (1992) (emphasis added).[10] The party

10. As provided in the Restatement (Second) of Contracts § 350:

(1) Except as stated in Subsection (2), damages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation.

(2) The injured party is not precluded from recovery by the rule stated in Subsection (1) to the extent that he has made reasonable but unsuccessful efforts to avoid loss.

that breached the contract has the burden of showing how the losses could have been avoided through reasonable efforts of the injured party. *Id.*

Stein–O'Brien testified that Unit 29 began to experience leaks in 1999 and that she did not rent out Unit 29 after May 2000. The reasons therefor conflicted. She stated that she released tenants for personal reasons and then used Unit 29 to store furniture. She also stated that Unit 29 had deteriorated into a "slum" over a period of years, making the unit impossible to rent. It was for the jury to decide, as fact, what caused Unit 29 not to be rented from 2000 to 2005.

In any case, Stein–O'Brien did not inform the Association in writing about any roof problems until 2004 and made no mention of lost rental income in that letter. It cannot be assumed, but rather must be proved, that lost rental income was an item of contract damages anticipated by the parties when Stein–O'Brien purchased Unit 29. However, assuming she proved that it was reasonable for the Association to anticipate such a claim would follow from its failure to maintain a common element, Stein–O'Brien's dilatory conduct must also be considered. Stein–O'Brien waited until July 2005, over five years after she had stopped renting out Unit 29, to correct the leaks by replacing the roof. In the meantime, she stood by while Unit 29 deteriorated into what she described as "slum conditions." The Association had the duty to maintain the roof, but it did not undertake to guarantee Stein–O'Brien a

successful business. Stein–O'Brien should have replaced the roof in 2000 and simply sent the bill to the Association.[11] Her five-year delay raises a question as to whether Stein–O'Brien took reasonable steps to mitigate damages, assuming that all problems in Unit 29 related to the roof, as opposed to being caused by the air-conditioning platform, the deck or some other title area that was Stein–O'Brien's responsibility.

The Association also points out, *inter alia,* what it believes to be errors with respect to the documents Stein–O'Brien offered into evidence.[12] Exhibit D–29 is a handwritten list of expenses totaling $3,955.33 with dates from 1999 to 2005; this list was prejudicial because it moved the damage claim from 2005, when the roof was repaired, back to 1999. Exhibit D–30, the handwritten list of cash payments made to Keith Carrington totaling $14,400, was prejudicial because it moved the damage claim back to 2000 and because Stein–O'Brien offered no detail on what Carrington was paid for in cash. Exhibits D–32 and D–33 which are pages of receipts from Home Depot and Lowe's totaling $2,300.31 and $385.30, were admitted with only Stein–O'Brien's bare statement that they related to Unit 29. Further, these receipts duplicate items in Exhibit D–29. Exhibit D–34 is an estimate from Hannigan for deck work for $3,200, but the deck is not the Association's responsibility, and there was no evidence presented to link the deck to the Association's responsibility

11. In any case, Stein–O'Brien's evidence did not explain whether her inability to rent Unit 29 resulted from leaks from the roof, leaks from the deck, her choice to release tenants because one was getting married or her decision to use Unit 29 for storage.

12. With respect to the trial court's evidentiary rulings, our standard of review is extremely narrow. The admission or exclusion of evidence is a matter within the sound discretion of the trial court and may only be reversed upon a showing of a manifest abuse of discretion. *Lock v. City of Philadelphia,* 895 A.2d 660, 665 (Pa.Cmwlth.2006). To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party. *Id.*

under the contract. The Association also contends that Exhibits D–44 through D–47, the estimates from James Lesher totaling $4,470 for future work to be done and Exhibit D–48, the painting estimate from John Neill totaling $19,970, are hearsay and should not have been admitted.[13]

We agree that there are numerous problems with Stein–O'Brien's exhibits. Those dealing with past damages are non-specific and do not explain which expenses were attributable to problems with the main roof and which expenses related to damages from the air-conditioning platform, deck and patio areas. The same is true of Exhibits D–44 and D–46, which purport to provide estimates for future work. Exhibit D–45 contains an estimate for work to the heater room and Exhibit D–47 estimates the cost for a new patio door; neither of these items appear to be the Association's responsibility. The painting estimate is very specific, but again, the jury must determine whether it is for space that is the Association's responsibility.[14]

■ We next consider the Association's argument that the trial court's award of attorney's fees to Stein–O'Brien violated Article V, Section 5, of the Code of Regulations. This section provides in relevant part:

> If any action is brought by one or more but less than all UNIT OWNERS ... against the COUNCIL, the officers, assistant officers, employees or agents thereof, in their capacities as such, with the result that the ultimate liability asserted would, if proved, be borne by all the UNIT OWNERS, the plaintiff's expenses, including counsel fees, shall not be charged to or borne by the other UNIT OWNERS, as a COMMON EXPENSE or otherwise.

Code of Regulations, Article V, Section 5, R.R. 249a. It could not be clearer that a unit owner, such as Stein–O'Brien, cannot hold other unit owners liable for her legal fees, assuming she were to prevail in a new trial.[15]

Finally, we turn to the Association's argument that the trial court erred in awarding the delay damages. The Association contends that delay damages are not available in a contract case and that, at any rate, the excessive time delays were the fault of Stein–O'Brien.

■ Rule 238 of the Pennsylvania Rules of Civil Procedure governs awards of delay damages.[16] Our Supreme Court has unequivocally held that "Rule 238 de-

---

**13.** We will not address any hearsay issues at this point.

**14.** We agree with the Association that the trial court, through its errors, "made it a foregone conclusion that the jury would find that any water damage was the responsibility of the [Association] rather than the owners" and that "once the numbers were permitted to go to the jury by the Court there was no stopping the cumulative effect of the alleged damage(s)." Association brief at 8, 10.

**15.** The Association also challenged the judgment of $310,820.58 as too high because it did not contain an offset for its legal expenses to collect Stein–O'Brien's assessment. Article VI, Section 9(a) of the Code of Regulations authorizes reimbursement for such legal ex-

penses. The trial court *did* direct a verdict for the Association for both unpaid condominium fees and for attorney's fees, and instructed the jury to determine an appropriate amount of attorney's fees to be awarded. The jury inexplicably awarded zero dollars in attorney's fees. This is a situation where the trial court should have granted judgment n.o.v. for a reasonable amount of attorney's fees. However, because we grant a new trial, the issue is moot.

**16.** Rule 238 provides in relevant part:

(a)(1) At the request of the plaintiff in a civil action seeking monetary relief for bodily injury, death or property damage, damages for delay shall be added to the amount of compensatory damages awarded against

lay damages are not available in a breach of contract action where the damages sought are measurable by actual property damage." *Touloumes v. E.S.C. Incorporated,* 587 Pa. 287, 298, 899 A.2d 343, 349 (2006). Delay damages are applicable to tort actions, not breach of contract actions, and counsel for Stein–O'Brien expressly stated on the record that her claim was solely contractual.[17] Therefore, delay damages were not available in this case, and the trial court erred in awarding them.

In summary, we reverse the trial court's denial of a new trial. We also reverse the trial court's order awarding the damages found by the jury as well as delay damages. We remand for a new trial to be conducted in accordance with this opinion.

### ORDER

AND NOW, this 8th day of June, 2009, the order of the Court of Common Pleas of Philadelphia County in the above-captioned case, dated August 24, 2007, denying the post-trial motion filed by the Association of the Condominium at the Court at Old Swedes is hereby REVERSED. The order dated September 13, 2007, entering judgment in the amount of $310,820.58, including delay damages, to Emily Stein–O'Brien and Charles P. O'Brien is REVERSED, and the matter is REMANDED for a new trial in accordance with the attached opinion.

Jurisdiction relinquished.

---

each defendant or additional defendant found to be liable to the plaintiff in the verdict of a jury … and shall become part of the verdict, decision or award.

(2) Damages for delay shall be awarded for the period of time from a date one year after the date original process was first served in the action up to the date of the award, verdict or decision.

\* \* \*

(b)(1) The period of time for which damages for delay shall be calculated under subdivision (a)(2) shall exclude the period of time, if any,

\* \* \*

(ii) during which the plaintiff caused delay of the trial.

Pᴀ R.C.P. No. 238.

**17.** At hearing, the exchange was as follows:

**The Court:** Wait a minute. You're suing on your counterclaim in contract?

**Stein–O'Brien counsel:** Yes.

**The Court:** Anything else?

**Stein–O'Brien counsel:** We're suing in contract.

**The Court:** Period.

**Stein–O'Brien counsel:** Period.

**The Court:** The breach of the contract is what?

**Stein–O'Brien counsel:** The breach of the contract is the breach of the duties, obligations and responsibilities of the Condominium Association to maintain, control, repair common areas and common elements….

R.R. 96a–97a.