J-A04005-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| LISA GARDNER AND MARK MONAHAN, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellees | |
| v. | |
| LEE BRUDER, T/D/B/A BRUDER CONSTRUCTION CO., | |
| Appellant | No. 672 WDA 2014 |

Appeal from the Judgment Entered March 31, 2014
In the Court of Common Pleas of Allegheny County
Civil Division at No(s): AR-12-001706

BEFORE: BOWES, OLSON, and STRASSBURGER,[*] JJ.

MEMORANDUM BY BOWES, J.:                   **FILED JULY 10, 2015**

Lee Bruder t/d/b/a/ Bruder Construction Co. appeals from the judgment entered on the non-jury verdict in favor of Lisa Gardner and her husband, Mark Monahan (collectively referred to as "Appellees"), in the amount of $21,655. We affirm in part, reverse in part, and remand with instructions.

On March 26, 2011, Appellees entered a written contract with Appellant to demolish an existing garage behind Appellees' home in the Mexican War Streets neighborhood of Pittsburgh, Pennsylvania, and build a new two-car garage. Pursuant to the written accord, a form contract published by the American Institute of Architects ("AIA"), Appellees would

---

[*] Retired Senior Judge assigned to the Superior Court.

compensate Bruder $27,475, subject to additions and deductions as provided by the agreement.[1]

According to the scope of work document attached to the written agreement, the original plan was to build a detached one-level carriage-house style[2] garage with a pitched roof. Those plans outlined a garage constructed of 620 square feet of masonry block with brick veneer covering the front and rear walls from ground to the gutter. The front side of the garage incorporated a wood-clad two-bay garage door. The rear of the structure had an additional single car garage door, a window, and a door for pedestrian access. The contract amount included the cost to build a 6' x 12' trussed roof with appropriate weatherization, shingles, gutters, and downspouts. While not expressly included in the scope of work that Appellant presented to Appellees prior to executing the construction contract, the agreement also covered several items that had been previously agreed upon. That work included connecting the garage to the existing electrical supply in the residence, installing an electric garage door opener,

_____

[1] The parties employed the 1987 edition of AIA Document A107 entitled "Abbreviated Form of Agreement Between Owner and Contractor."

[2] A carriage-house style of garage generally refers to a detached garage with living space above the garage area. In order to save money on construction cost, the initial construction plan omitted the second-floor living space completely. However, as discussed in the body of this memorandum, Appellees ultimately settled on a one-and-one-half-story structure in that style.

digging a trench for the installation of PEX water supply lines, and grading the back yard for proper drainage. Prior to signing the construction agreement, Mr. Monahan listed the omitted tasks on a Post-It note in Appellant's presence and affixed that note to the scope of work that Appellant had prepared. Appellant eventually executed a change order (Change Order No. 2) that acknowledged those tasks as included in the original contract.

The demolition phase started as scheduled and construction progressed for approximately one month. On April 28, 2011, the parties agreed to amend the scope of work to include a stripped-down one-half story addition for $6,750.[3] To facilitate the alterations, Appellant drafted Change Order No. 1 that read, "Build additional '1/2 story' onto garage of 725 SF of 8[″] block. Included are two dormer openings; one at yard and one at street side." Defendant's Exhibit C. Appellant signed the change order and presented it to Appellees for approval.

Concerned that the change order was too vague and that Appellant had, again, omitted agreed upon tasks, Mr. Monahan drafted a revised change order that specified the height of the one-half story addition (six feet), the pitch of the roof (6' x 12'), and the composition of the window or

_____

[3] The revisions did not include a staircase or any interior framing. The one-half-story interior was essentially a shell that Appellees could finish in the future.

- 3 -

door to be placed in the two dormer openings. In addition, the revised change order included cutting and installing a window in the south facing gable and additional brick veneer covering the front, rear, and exposed side of the structure. As Appellees interpreted their agreement with Appellant as including these items, the revised change order did not alter the expected increase of $6,750 to the contract price.

Appellees executed their version of the change order and mailed it to Appellant along with a $5,000 progress payment and the $6,750 advance payment that Appellant requested to construct the addition. Appellant did not sign the amended change order, but he accepted both payments and continued to perform the construction work according to the revised design. In the ensuing months, Appellees became dissatisfied with Appellant's lack of progress and the quality of the work he performed. They also were unhappy with Appellant's failures to repair damage that his employees caused to the neighboring property or to execute the revised Change Order No. 1. Appellant never repaired the damage satisfactorily or executed the revised Change Order No. 1. Indeed, the scope of the work contained in that change order was contested at trial and it remains a central contention on appeal.

Ultimately, it became apparent that the parties disagreed about the scope of Change Order No. 1. and the additional costs associated with Appellees' proposed alteration of the planned electrical system. As it relates to the substantial electrical alterations, on July 18, 2011, Appellees paid

Appellant $1,500, which they believed covered the cost of permits and materials. On July 20, 2011, Appellant prepared Change Order No. 3 in the amount of $4,500. The change order, which Mr. Monahan denied receiving, purportedly covered the following:

1. Add 100A[4] electrical panel in the garage [and] 100A service at exterior.

2. Add 8 receptacles in conduit on interior walls.

3. Provide City of Pittsburgh electrical inspection.

Defendant's Exhibit L. Appellant completed portions of the electrical alterations, but the extent of Appellant's performance under the proposed change order is unclear from the certified record. Conversely, the record reveals that Appellant's proposed $4,500 increase under Change Order No. 3 did not include Appellees' prior $1,500 payment. *See* Defendant's Exhibit S.

After communications soured, the pace of work slowed, and Appellant eventually stopped performing. By August 17, 2011, Appellees had paid Appellant $28,250 toward the contract price of $34,225. Appellees requested a refund for work that was not completed. Appellant countered with demands for payment for work he performed beyond the scope of the contract prior to Appellees' decision to terminate the contract, *i.e.*, the additional brick veneer and the expanded electrical work.

_____

[4] The ampere, also identified and "A" or "amp," is the base unit for measuring electric current.

On March 13, 2012, Appellees filed a civil complaint against Appellant seeking $21,655 in damages. Appellant eventually filed a counter claim for unjust enrichment totaling $14,775.[5] The matter was assigned to compulsory arbitration, and the board of arbitrators awarded Appellees the damages they requested. Appellant appealed the award, and the case proceeded to a nonjury trial *de novo* on September 17, 2013.

During trial, Mr. Monahan testified on behalf of Appellees. He presented documentation of a $670 payment to a third party to repair the damage that Appellant caused to a neighboring property and to perform masonry work on the garage. In addition, Mr. Monahan submitted two estimates outlining the projected cost to fix Appellant's work and to complete construction. The two estimates projected the total remaining costs to be $27,000 and $17,056 respectively.

Mr. Bruder testified on his own behalf. Essentially, he attested that the $6,750 increase in the contract price, as outlined in his Change Order No. 1, only covered the expense of constructing the one-half story addition out of masonry block. He explained that his quote did not include the additional cost to affix brick veneer to the masonry block on the one-half story addition, to purchase and install windows in the newly created dormer openings, or to cut an opening and install a window under the south-facing

---

[5] Appellant initially leveled multiple legal theories; however, the claim for unjust enrichment was the only count to withstand preliminary objections.

gable. He also challenged Appellees' evidence regarding the extent of his performance under the contract, the accuracy of the estimated expense of completing the tasks envisioned in the contract, and the uncontested portions of the two change orders.

As it relates to his counter claim, Mr. Bruder adduced evidence that, after applying Appellees' prior payments in the amount of $28,250 and crediting Appellees $3,500[6] for work that Appellant admittedly failed to perform under the contract, Appellees still owed him $14,275 for work that he completed. The bulk of that amount was $7,300 for the brick veneer that Appellant affixed to the one-half story addition and $4,500 for the expanded electrical work.

On September 19, 2013, the trial court entered a non-jury verdict in favor of Appellees and against Appellant in the amount of $21,655. It rejected Appellant's counterclaim. Thereafter, the trial court denied post-trial relief, and on March 31, 2014, it entered judgment on the verdict. This timely appeal followed.

Appellant presents one question: "Whether the verdict is so outrageous that it is shocking to a sense of fairness and justice so as to warrant a new trial?" Appellant's brief at i. Our well-ensconced standard of

_____

[6] Appellant admitted that he failed to install roofing shingles, gutter and downspout, window sills, and the pedestrian door. **See** Defendant's Exhibit S.

review from a non-jury trial verdict is as follows: We must "determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law." **_Allegheny County Housing Authority v. Johnson_**, 908 A.2d 336, 340 (Pa.Super. 2006) As with all questions of law, the trial court's legal conclusions "are not binding on an appellate court because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts of the case." **_Id_**. (internal citation omitted). However, we give great deference to the trial court's factual findings, which "must be given the same weight and effect on appeal as the verdict of a jury." **_Id_**. Finally, "We consider the evidence in a light most favorable to the verdict winner [and] we will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law." **_Id_**.

Appellant challenges the trial court's determination that he was responsible for Appellees' costs to complete the work that he never agreed to perform. His claim is two-fold. The initial aspect of Appellant's argument concerns the scope of Change Order No. 1 and the second component affects the calculation of Appellees' damages in relation to the value of the work that he allegedly performed without compensation. We address these positions *seriatim*.

First, Appellant contends that the version of Change Order No. 1 that he submitted to Appellees accurately reflected the scope of the work that he

envisioned in his $6,750 quote regarding the addition, *i.e.*, constructing a one-half-story addition using 725 square feet of eight-inch masonry block and building opposing dormer openings in the roof of the structure. Appellant continues that all of the remaining work that he completed on the one-half-story addition at Appellees' directives, including installing the additional brick veneer and performing the expanded electrical work, was outside the scope of the contract and that he should not be required to bear the substantially increased costs associated with his performance. Accordingly, Appellant contends that he is entitled to payment from Appellees for the value of the extra work. Appellant also argues that the evidence that Appellees submitted regarding the cost of completion did not reflect the parties' written agreements. He posits, Appellees "presented estimates at trial of what it would cost to finish a building that was larger and more elaborate than the building referenced in the signed contract [and] [Appellant] never agreed to build the structures reflected in the estimates." Appellant's brief at 10.

The only contract document that both parties admittedly executed is the A107 form contract. Additionally, the parties agreed to Change Order No. 2, which memorializes the Post-It note that Appellees affixed to the written contract before signing it. The crux of this dispute is the scope of Change Order No. 1 regarding the construction of the one-half story addition and the extent of the revised electrical work. As noted, the parties submitted countervailing interpretations of the two versions of Change Order

No. 1 and never fixed the cost of the revised electrical alterations that Appellant completed.

In discounting Appellant's position, the trial court concluded that Change Order No. 1 included, *inter alia*, the cost to procure and install three windows and 513 square feet of brick veneer on the exposed portions of the one-half story addition. While the court made an express finding as to the brick veneer, there was no definite finding as to the three windows. Nevertheless, in light of the fact that the trial court included the omitted windows in its calculation of the damages Appellees incurred as a result of Appellant's incomplete performance, the trial court necessarily determined that the three windows were within the scope of Change Order No. 1. As we highlight *infra*, the certified record supports both aspects of the court's conclusion. Accordingly, we do not disturb it.

During the nonjury trial, Mr. Monahan testified that he and his wife, Ms. Gardner, contracted with Appellant to build the distinctive carriage-house style garage behind his home. N.T., 9/17/13, at 16-17. As Mr. Monahan was uneasy with the lack of specificity in the scope of work outlined in the contract documents that Appellant presented, he affixed a Post-It note to the contract that listed four additional tasks that Appellant agreed to perform but had omitted from the written instrument. *Id*. at 19-20. After construction started, Mr. Monahan spoke with Appellant about building a one-half-story shell on top of the the planned structure. *Id*. at 22-23. Thereafter, Appellant proffered a $6,750 quote to construct what

was then envisioned as a one-and-one-half-story garage and he produced a change order to that effect. *Id*. at 24. Mr. Monahan believed that the proposed Change Order No. 1 was "extremely vague and [did not] reflect the conversations that we had had about [the garage] that were more specific than that." *Id*. Accordingly, Mr. Monahan prepared a revised change order that identified "specifics about the roof pitch[,] . . . [verified] that each window opening would have either a door . . . or window[,] . . . [a]nd . . . added a line about [the] front, rear and exposed side [having] brick veneer." *Id*. at 25. At trial, he explained that the initial contract for the one-story garage only encompassed brick veneer on the front and rear of the building, but since the exposed portions of the revised structure would be visible from the street, it had to be covered by brick veneer to comply with the neighborhood's historic codes. *Id*. at 25-26.

While Appellant failed to sign Mr. Monahan's revised change order, he never advised him that the windows and brick veneer were not included in the new contract price. *Id*. at 28-29, 31. Additionally, as it relates to the veneer, Appellant constructed the one-half story to accommodate the application of the brick veneer. *Id*. at 29. Mr. Monahan explained,

> the side [of the garage] facing my neighbor's garage, which is a single story, is constructed of eight-inch wide block. And so at the point where it was going to become exposed above my neighbor's garage, it transitioned from eight-inch wide block to four-inch wide, which allows for the four inches of the brick next to it.

So for the remainder for the exposed side you've got four-inch wide block and four-inch wide brick running up the rest of the side.

*Id*. at 29. Indeed, as noted *supra*, Appellant eventually applied the brick veneer to all of the exposed sides of the building that were visible from the street. *Id*. at 74, 76. Appellant did not indicate that the veneer was an extra cost until after he substantially competed that portion of the job. *Id*. Thus, the certified record supports the trial court's finding regarding the scope of the original contract and Change Order No. 1

Having found that the record sustains the court's determination that the installation of additional brick veneer and dormer windows were included in the new contract price of $34,225, we next examine the record regarding Appellant's performance of the modified contract. The focus of our review is upon whether Appellant performed as expected. For the reasons that follow, we find the record proves that he did not.

During the trial, Mr. Monahan introduced photographs depicting Appellant's incomplete and unsuitable performance. For example, the photographs illustrated that Appellant framed the roof improperly and that the misaligned roof created large gaps where the roof met the dormers and the masonry blocks. *See* Plaintiff's Exhibit 13, Photographs #11 and #18. The condition was aggravated by the fact that Appellant's masonry work was incomplete on one side of the garage insofar as it did not ascend the entire height of the structure. *Id*. Appellees also documented that Appellant constructed the opposite wall at the incorrect pitch. N.T., 9/17/13, at 61;

Plaintiff's Exhibit 13, Photograph #16. Additionally, since the roof was framed improperly, no overhang existed to use with the gutter system, which, along with the shingles and fascia board, Appellant neglected to install. *Id*. at 58-59; Photograph #13. Thus, as Mr. Monahan testified, "any precipitation would run down the wall rather than out into a gutter." *Id*. at 58. Other photographs demonstrated Appellant's failure to complete the brick veneer, lay the PVC conduit for the electrical lines, hang the electrical panel, and install the rear-facing garage door and windows in both of the dormer frames and the south-facing gable. *Id*. at 55-57, 59, 61-62; Exhibit 13; Photographs # 8, #9, #13, #16, and #18. Additionally, the masonry arch on the dormer was incomplete and Appellant did not install window sills on any of the windows. *Id*. at 75. All of the foregoing items, including the basic electrical work, were within the contract as expanded by Change Order No. 1. Finally, the record revealed that Appellant abandoned his scaffolding and pump jacks on Appellees' property. *Id*. at 56, 60; Photograph # 15. Mr. Monahan testified that, even after he and Ms. Gardner hired a crew to dismantle the equipment, Appellant neglected to remove it from Appellees' property for approximately one year. *Id*. at 56, 60.

As it relates to the physical damage that Appellant caused to the neighboring properties, Mr. Monahan stated that Appellant failed to repair either of the walkways that he and his employees damaged. N.T., 9/17/13, at 30. Likewise, Appellant neglected to fix the damage that he caused to Appellees' gate, fencepost, and porch steps or mend the damage that his

mason caused to the roof of a neighboring garage. *Id*. 46, 57; *see also* Plaintiff's Exhibit 13, Photograph # 12. In fact, when questioned about the repairs to Appellees' property, Appellant feigned ignorance about the fencepost, opined that rehanging the gate was not within the scope of the contract, and characterized the porch stairs that his company accidently demolished with a backhoe as "deficient" in the first place. N.T., 9/17/13, at 97-98, 100. Appellant did not contest Appellees' assertion that none of the repairs was performed.

Concerning Appellant's imperfect performance, Appellant conceded that he neglected to complete the roof and gutter work, hang the barn door at the rear of the garage, install a seal on the garage door, dig the trench for the electrical and water lines, grade the yard for drainage, and finish the masonry arch on the ground-level rear window. *Id*. at 97-99, 100.[7] He characterized that work as minimal and he estimated that the tasks could be completed for approximately $3,500. *Id*. at 95; Defendant's Exhibit S. For

_____

[7] Appellant acknowledged that he installed only one of four windows, but he reiterated his position that the windows that he declined to install were not included in the contract price. N.T., 9/17/13, at 95-97. Similarly, he asserted that the contract had not budgeted for him to cut the window opening under the gable, lay veneer around that window, attach wood cladding to the garage door, and paint any portion of the structure. *Id*. at 88-89, 97, 99, 101. He claims that all of these items are outside the scope of his contract with Appellees. *Id*. at 88-89, 97, 99, 101. However, as noted in the body of this writing, the trial court found, either expressly or implicitly, that these items were included in the contract price, and with the exception of Appellant's alleged responsibility to paint the garage, the record sustains that finding.

example, Appellant opined that it would cost $75 to complete the masonry work and $150 to correct the framing issue. N.T., 9/17/13, at 100.

Notwithstanding Appellant's protestations to the contrary, the foregoing evidence demonstrates that Appellant failed to perform as expected under the contract. Appellant performed certain tasks and neglected others. Moreover, some of the work was only partially complete and aspects of the work that Appellant did perform were not done in workmanlike manner. The roof was unfinished and poorly framed. Appellant neglected to install shingles, fascia board, or a gutter and downspout system. He failed to complete the required masonry work and preliminary electrical work under the contract, and he damaged Appellees' property and the property of their neighbors. Stated simply, the evidence sustains the trial court's findings regarding Appellant's lack of performance under the modified contract. Thus, for all of the foregoing reasons, we find the trial court did not err in framing the scope of Appellant's performance under the contract and in determining that certain aspects of the work Appellant was required to perform under the contract were either ignored, incomplete, or deficient. Hence, Appellant is responsible for the natural and ordinary costs associated with completing the garage that Appellant agreed to build.

The second cog in Appellant's reasoning challenges the trial court's calculation of the damages it awarded to Appellees. Preliminarily, Appellant complains that the two estimates that Appellees adduced to establish their

damages related to a "vastly expanded project that [he] never agreed to complete." Appellant's brief at 8. While Appellant's brief does not elaborate upon this position fully, it is clear from his testimony and legal position throughout the litigation that he believes that the scope of the construction project was limited to his interpretations of the contract and Change Order No. 1. That is to say, from Appellant's perspective, the only items that were included in the modified contract following the change order were the construction of (1) the one-half-story addition from 725 square feet of masonry block; and (2) a roof with two dormer window openings. As noted *supra*, however, the record supported the trial court's findings that Change Order No. 1 included, *inter alia*, the installation of three windows and additional brick veneer over the exposed portions of the structure. Thus, we rebuff Appellant's current line of argument for the identical reason that we rejected his earlier contention.

The remaining component of Appellant's argument, which challenges the logic of the trial court's damage award, is more nuanced. Appellant argues that the verdict has no support in the law or facts of this case. We disagree with the overly simplistic perspective that the damage award is utterly without support. However, our review revealed signficant irregularities in the trial court's rationale.

Where the issue is not derived from a question of law, we review a challenge to the calculation of damages for an abuse of discretion. ***J.J. DeLuca Co., Inc. v. Toll Naval Associates***, 56 A.3d 402, 417 (Pa.Super.

2012). As our Supreme Court reiterated in **Helpin v. Trustees of University of Pennsylvania**, 10 A.3d 267, 270 (Pa. 2010) (quoting **Ferrer v. Trustees of the University of Pennsylvania**, 825 A.2d 591, 610 (Pa. 2002)),

> Where one party to a contract without any legal justification, breaches the contract, the other party is entitled to recover, unless the contract provided otherwise, whatever damages he suffered, provided (1) they were such as would naturally and ordinarily result from the breach, or (2) they were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and (3) they can be proved with reasonable certainty.

The High Court continued, "The purpose of a damage award is to place the non-breaching party 'as nearly as possible in the same position it would have occupied had there been no breach.'" **Id**. (quoting **Lambert v. Durallium Products Corporation**, 72 A.2d 66, 67 (Pa. 1950)). Indeed, "[t]he measure of damages for breach of contract is *compensation* for the loss sustained [and] [t]he aggrieved party can recover nothing more than [what] will compensate him." **Id**. (citation omitted) (emphasis in original).

The fact-finder may not render a verdict based upon conjecture; however, it may use a measure of deductive reasoning in estimating damages. **See J.J. DeLuca Co., Inc.**, **supra**, at 417. "The fact-finder may make a just and reasonable estimate of the damage based on relevant data, and in such circumstances may act on probable, inferential, as well as direct and positive proof." **Id**. at 417-418.

Herein, Appellant failed to complete the following tasks pursuant to the original contract and Change Order No. 1: (1) correct the roof framing and install sheathing, shingles, gutters, fascia boards, and downspout; (2) install three windows; (3) hang garage door in rear; (4) clad, seal and install large garage door; (5) dig trenches for electrical and plumbing conduits; (6) rough grade the back yard for drainage; (7) install window sills; and (8) complete the masonry arch over the yard-facing window. In addition, Appellant is responsible for Appellees' expenditures to fix the roof of their neighbor's garage, repair the wooden gate, fence post, and shared walkway on their property, and to replace the missing porch steps that were obliterated by Appellant's backhoe. Accordingly, the trial court's award of damages must reflect the sum of the costs to complete, repair, or replace these items.

Instantly, the trial court explained the calculation of its $21,665 damage award in favor of Appellees as follows:

> The parties had originally contracted for services from Bruder to construct a carriage house in the agreed upon amount of $27,475.00. Subsequently, the plaintiffs requested construction of an additional one-half story for the carriage house and, pursuant to code, required brick veneer on all exposed outside surfaces of the entire structure. That change increased the initial cost of the contract by $6,750.00, resulting in a total cost of completion of $34,225.00. Plaintiffs paid $28,225.00 to Bruder toward that total cost. When Bruder failed to complete the work, Plaintiffs expended $27,000.00 to finish the project within the scope of the amended agreement and paid an additional $670.00 to cure damage allegedly occasioned by Bruder's negligence to a neighboring property in the course of his performance.
>
> . . . .

- 18 -

The plaintiffs were required to take the project to completion and to meet additional costs that, but for Bruder's failure to perform, would not have been incurred. The cost of completion was established at trial to be $27,670.00. That figure was pursuant [to] an estimate of $27,000.00 not only to complete the project but also to correct mistakes attributed to Bruder and by an additional $670.00 repair estimate for damage done to the adjacent property.

The cost incurred by the plaintiffs was $55,895, which is the sum of the amount paid to Bruder and the amount required to complete the project after Bruder had ceased to perform: [$]28,225 + [$]27,670. Plaintiffs acknowledge that the total contract price with Bruder would have been $34,255.00. That amount was not, in fact, paid in full to Bruder, but plaintiffs concede that that sum would have been paid to Bruder had he completed the project. The damages due to the plaintiffs is the cost of the completed project less the sum Bruder would have received from plaintiffs had he fully performed the contract; that is, $58,895 less $34,225 or $21,670. The Court awarded $21,665; the amount pled.

Trial Court Opinion, 7/22/15, at 4-5 (footnote omitted).

At the outset, we observe that the certified record supports the trial court's calculation of the $670 that Appellees paid to Mike and Mark Geissinger for repairs to their neighbor's roof and Appellant's inadequate masonry work. *See* Exhibit 14. Accordingly, we do not disturb that aspect of the court's calculation.

The only evidence that Appellees proffered during the trial relating to the cost of completing construction were two estimates, Plaintiff's Exhibits

15 and 16, respectively.[8]    Exhibit 15 is an email exchange between Mr.

Monahan and Bob Cullen, a prospective contractor, wherein Mr. Cullen

_____

[8] Both estimates were submitted in response to the following bullet-point list of work that Mr. Monahan believed was required to complete the garage renovation:

> • Install rectangular, double hung, wood framed windows on front, back, side (3 total)[;]
>
> • Finish roof framing to give proper overhang[;]
>
> • Install fascia boards on gable sides of balding (1x10)[;]
>
> • Install half-round gutters and round downspouts[;]
>
> • Install shingles on roof to match house[;]
>
> • Paint and hang sliding wood "barn" doors on track in yard-facing opening[;]
>
> • Re-hang wood gate at end of pathway to alley[;]
>
> • Dig trench between garage and house and install "conduit" for plumbing supply lines[;]
>
> • Pull circuit through existing conduit to provide power for garage door opener and an outlet[;]
>
> • Repair damaged fence (post leaning due to concrete base being exposed)[;]
>
> • Replace missing wood steps from yard to deck[;]
>
> • Re-grade yard for proper drainage to pathways and alley[;]
>
> • Install seal on existing 16' garage door[;]
>
> • Attach wood (cedar . . . ) cladding to 16' Masonite door to replicate older-style wood doors[;]

*(Footnote Continued Next Page)*

responded to Appellees' bullet-list of tasks by submitting a rough estimate of $27,000. Conversely, Exhibit 16 was an itemized proposal submitted by Horn Corporation ("Horn") that set forth a thorough description of the precise work that it would perform for an estimated cost of $17,056.00.

The trial court neglected to explain why it adopted Mr. Cullen's rough calculation of $27,000 over Horn's quote to perform the work for $17,056.00. In fact, other than a brief reference to Appellant's argument, the trial court failed to acknowledge the existence of the lower estimate. That omission is especially problematic in light of the fact that Mr. Cullen's appraisement conceded that the project was "very hard to estimate," **see** Exhibit 15, and Horn submitted a detailed quote setting forth each task individually. **See** Exhibit 16.

During the trial, Mr. Monahan testified that Mr. Cullen's approximation was a more accurate depiction of his damages because Horn's estimate did not include some of the items on his bullet-point list. N.T., 9/17/13, at 65.

*(Footnote Continued)* ─────────────────

- Finish masonry

     o . . . finish bottom of yard-facing garage door opening to allow garage door to land properly

     o Finish brick jack arch above ground level yard-facing window

Plaintiff's Exhibit 15. The only responsibility identified in the itemized list that was not expressly or implicitly included in the contract documents is painting the large barn doors at the rear of the garage. Accordingly, that cost is not attributable to Appellant.

While Mr. Monahan did not identify which jobs were omitted from Horn's quotation, our review of Exhibit 16 reveals that the quote did not include the costs to repair Appellees' fence, grade the back yard, transfer the main electrical supplying wire to the new pole on top of the garage, supply the negligible amount of bricks to complete the masonry arch over one window, or paint the barn doors. These five enumerated tasks that Horn omitted from its quote do not explain the $10,000 variance between the two estimates.

First, as noted in footnote eight on pages 20-21, Appellant was not responsible for painting the barn doors so that cost was properly omitted from the quote. Conversely, since Mr. Cullen's estimate appears to include painting, the court's reliance upon that aspect of the estimate in calculating Appellees' damages is improper. Additionally, we observe that Mr. Cullen's estimate excludes at least one item that was included in Horn's quotation, the decorative cladding for the garage door, and consistent with Horn's quotation, Mr. Cullen's estimate **also** excluded the costs associated with the masonry work. N.T., 9/17/13, at 63; Exhibit 15. For these reasons, the exclusions noted in the Horn quotation fail to explain why Mr. Cullen's estimate exceeded Horn's quotation by approximately $10,000. The record simply does not sustain Mr. Monahan's characterization of the Cullen estimate as a more accurate assessment of damages.

While the trial court was free to reject all, any, or none of Appellees' evidence relating to damages, including Horn's estimate of the cost to

complete the garage, the certified record must nevertheless sustain the court's decision to adopt the Mr. Cullen's estimate *in toto*. **See J.J. DeLuca Co.**, **supra** ("the fact-finder may not render a verdict based on sheer conjecture or guesswork"). Instantly, nothing in the certified record begins to explain the substantial disproportion of projected costs in the two estimates, and the trial court did not attempt to reconcile that disparity. Moreover, Mr. Cullen's express qualifications that the project that was difficult to evaluate and that his appraisal was a rough estimate thwarts any potential inference that his assessment was intrinsically accurate, particularly when Horn presented a categorical proposal to perform the work for approximately $10,000 less.

Thus, mindful of the unexplained variance between the two estimates, and the fact that Mr. Cullen's estimate included costs associated with a task that was not Appellant's responsibility to complete, we find that the record does not support the court's wholesale adoption of Mr. Cullen's estimate of $27,000. At a minimum, assuming the accuracy of all remaining aspects of Mr. Cullen's approximation, the trial court's estimate of Appellees' damages must be reduced by the projected cost of painting the barn doors.

In addition to the foregoing discrepancies, the trial court's calculation of damages also ignores Appellant's performance of the electrical work beyond the original contract and Change Order No. 1. As noted *supra*, during construction, Appellees expanded the scope of the electrical work to be performed on the garage. While the extent of Appellant's performance is

unclear, it is apparent from the certified record that: (1) Appellant completed a portion of the expanded electrical work; (2) four days prior to discontinuing their relationship with Appellant, Appellees conceded that they owed Appellant money for that work beyond the initial payment of $1,500; and (3) the trial court did not adjust the damage award to account for that debt. N.T., 9/13/15, at 45, 48, 70; Defendant's Exhibit L, at 2 ("Upon completion on or by [August 29] we will make final payment of the remaining $6,195 **plus** the remainder due for the electrical work.") (emphasis added).

Herein, the trial court based its calculation of damages upon Appellees' payment of $28,250, including the $1,500 payment for electrical work, toward the $34,225 contract price. However, since the trial court did not account for any electrical work beyond what was originally envisioned, it neglected to determine the cost of Appellant's performance of the expanded electrical alterations and it omitted that figure from its calculation. Thus, in order to make the parties whole, the trial court was required to increase the contract price in the amount equal to Appellant's cost of performance, presumably an amount between $1,500 and $4,500 based upon the evidence submitted at trial, before it could compute Appellees' damages. As the trial court omitted the value of Appellant's performance from its equation, Appellees received a windfall equal to that amount.

Accordingly, for all of the preceding reasons we affirm the trial court's determination that Appellant was contractually obligated to perform in

accordance with Appellees' interpretation of Change Order No. 1 and that he is liable for the reasonably foreseeable costs to repair his mistakes and complete construction of the garage consistent with the contract documents. However, we vacate the judgment entered on the $21,655 verdict and remand for a new calculation of damages that is an accurate estimation of the cost to complete Appellant's contractual obligation and accounts for Appellant's performance of the expanded electrical work.

Affirmed in part, reversed in part, and remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/10/2015